J-A31033-17

2018 PA Super 16

ANITA E. TONG-SUMMERFORD, AS : IN THE SUPERIOR COURT OF
ADMINISTRATOR OF THE ESTATE : PENNSYLVANIA
OF MARVIN JEROME SUMMERFORD, :
DEC. :
:
:
:
:
v. :
:
: No. 3114 EDA 2016
:
ABINGTON MEMORIAL HOSPITAL :
AND RADIOLOGY GROUP OF :
ABINGTON, P.C. AND KRISTIN L. :
CRISCI, M.D. :
:
:
APPEAL OF: ABINGTON MEMORIAL :
HOSPITAL :

Appeal from the Judgment Entered September 2, 2016
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): No. 2010-35494

ANITA E. TONG-SUMMERFORD, : IN THE SUPERIOR COURT OF
ADMINISTRATOR OF THE ESTATE : PENNSYLVANIA
OF MARVIN JEROME SUMMERFORD :
:
:
:
:
v. :
:
:
:
ABINGTON MEMORIAL HOSPITAL, : No. 3310 EDA 2016
RADIOLOGY GROUP OF ABINGTON, :
P.C., VALERIE BONICA, D.O. AND :
KRISTIN L. CRISCI, M.D. :
:
:
APPEAL OF: RADIOLOGY GROUP OF :
ABINGTON, P.C., AND KRISTIN L. :
CRISCI, M.D. :

Appeal from the Judgment Entered September 2, 2016
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): No. 2010-35494

BEFORE: PANELLA, J., OLSON, J., and STEVENS*, P.J.E.

_____
* Former Justice specially assigned to the Superior Court.

OPINION BY STEVENS, P.J.E.:                    **FILED JANUARY 30, 2018**

In these consolidated appeals, Appellants Abington Memorial Hospital (hereinafter "AMH"); Kristin L. Crisci, M.D. (hereinafter "Dr. Crisci"); and Radiology Group of Abington, P.C. (hereinafter "RGA") (hereinafter collectively, at times, "Appellants") appeal from the judgment entered in the Court of Common Pleas of Montgomery County on September 2, 2016, at which time the trial court denied their respective post-trial motions, molded the verdict of $5,000,000 in favor of Anita E. Tong-Summerford, as administrator of the estate of Marvin Jerome Summerford, deceased, (hereinafter "Appellee") to add delay damages in the amount of $947,157.53, and ordered the delay damages to be apportioned between the Wrongful Death Act and Survival Act claims in the same proportionate allocation as in the verdict: 30% ($284,147.26) to the Wrongful Death Act claim and 70% ($663,010.27) to the Survival Act claim. Upon our review, we affirm.

The trial court set forth the facts and procedural history herein as follows:

> On November 30, 2008, Marvin Summerford, age 88, was transferred to the emergency department of Abington Memorial Hospital (hereinafter, "AMH" or the "Hospital") from a long-term care facility. Mr. Summerford's past medical history included dementia, hypertension, congestive heart failure, and pulmonary insufficiency. On December 1, 2008, Mr. Summerford suffered cardiac arrest secondary to pneumonia, and a code was called due to pulseless electrical activity, decreased heart rate, and low blood pressure. Mr. Summerford survived and was transferred to the ICU.
> On December 2, 2008, a feeding tube was inserted and an order was placed for an x-ray to confirm proper placement.[1] The

x-ray revealed that the tube had been inadvertently inserted into the lung and was therefore removed. The feeding tube was re-inserted, and another x-ray was ordered to confirm proper placement. Again, the feeding tube was not properly placed.

On the next day, December 3, 2008, Valerie Bonica, D.O., an AMH resident, inserted a new feeding tube into Mr. Summerford. Dr. Bonica ordered a portable chest x-ray to confirm proper placement of the tube at 3:55 p.m. In response to this order, x-ray technologist Jillian Nickel, an AMH employee, performed a portable x-ray at 4:53 p.m. capturing the lower chest and abdomen.[2] This image was interpreted by Kristin Crisci, M.D., a radiologist, who incorrectly read the study as showing termination of the feeding tube in decedent's stomach when, in fact, it terminated in Mr. Summerford's left lung. Dr. Crisci signed her report at 5:33 p.m. She did not order additional imaging. In reliance upon Dr. Crisci's report, Dr. Bonica ordered administration of a feeding solution (Jevity) at 10 cc's per hour for the first eight hours. The first feed was administered at approximately 11:00 p.m. on December 3, 2008. From 11:00 p.m. to 7:00 a.m. the next morning, 50 cc's of Jevity and 420 cc's of flush was administered through the feeding tube into Mr. Summerford's lung.

Mr. Summerford's condition deteriorated. At 4:38 a.m. on December 4, 2008, Dr. Bonica placed a STAT order for portable chest x-ray to aid in the diagnosis/treatment of pneumonia. The x-ray was completed at 4:46 a.m. but was not analyzed by a radiologist until 8:13 a.m., at which time the radiologist recognized the feeding tube was positioned in Mr. Summerford's left lung. By this time, Mr. Summerford had already been pronounced dead at 7:11 a.m. on December 4, 2008.

After a five-day jury trial, the jury returned a verdict on May 13, 2016 in favor of [Appellee] and against [Appellants] AMH and Dr. Crisci/Radiology Group of Abington, P.C. (hereinafter, "Dr. Crisci")[3] in the total sum of $5,000,000 ($1.5 million for the wrongful death claim and $3.5 million for the survival action claim). The jury apportioned liability as follows: AMH 25% and Dr. Crisci 75%. The verdict was molded to add Rule 238 delay damages for [Appellee] and against [Appellants], resulting in a molded verdict in the amount of $5,947,157.53.[4]

AMH and Dr. Crisci each filed timely motions for post-trial relief seeking judgment *n.o.v.,* a new trial, and remittitur. Following oral argument, on September 2, 2016 this court denied [Appellants'] post-trial motions, molded the verdict, and entered judgment on the jury verdict in favor of [Appellee] and against

[Appellants]. Thereafter, AMH and Dr. Crisci filed timely appeals,[5] which were consolidated on November 7, 2016 by Order of the Superior Court. On October 4, 2016, the court ordered defendants to file a concise statement of errors pursuant to *Pa. R.A.P. 1925(b)*.

_____

[1] The feeding tube is supposed to be inserted into the esophagus and end up in the stomach. However, due to the close proximity of the esophagus and trachea in the back of the throat and the difficulty visualizing the proper placement of the feeding tube for insertion, occasionally the feeding tube is inadvertently placed in the trachea instead of the esophagus. Accordingly, it is necessary that an x-ray be obtained to confirm proper placement of the tube into the stomach, as opposed to the lung, before feeding solution is administered through the tube. All parties agreed that it was not negligence for a feeding tube to be inadvertently inserted into the trachea instead of the esophagus. N.T. 05.09.16 (a.m.), p. 19.

[2] There was disagreement whether the image captured by the portable x-ray was an abdominal study or a lower chest study. Dr. Crisci testified that notwithstanding Dr. Bonica's order for a chest x-ray, the technologist performed an abdominal study. N.T. 05.10.16 (p.m.), p. 93. [Appellee's] expert Dr. Igidbashian testified that it was an abdominal study. N.T. 05.10.16 (a.m.), p. 95. However, AMH's expert, Dr. Hani Abujudeh, testified that," ... this was not a chest x-ray. It was not an abdominal x-ray. It was a hybrid x-ray, between a chest and an abdomen." N.T. 05.11.16 (p.m.), p. 144.

[3] It was stipulated that Dr. Crisci was an employee/agent of Radiology Group of Abington, P.C. ("RGA"). By agreement of all parties, Dr. Crisci and RGA appeared together on the verdict sheet. N.T. 05.12.16 (p.m.), p. 89-91.

[4] [Appellants] do not raise any issue on appeal regarding the addition of delay damages.

[5] AMH appeal Docket Number 3114 EDA 2016; Dr. Crisci appeal Docket Number 3310 EDA 2016.

Trial Court Opinion, filed 12/29/16, at 1-3.

On October 18, 2016, Dr. Crisci and RGA filed a timely Concise Statement of Errors Complained of on Appeal wherein they raised ten (10) issues. On October 25, 2016, AMH filed its Statement of Matters Complained of on Appeal wherein it also set fourth ten (10) issues.

In their brief, Dr. Crisci and RGA raise the following Statement of Questions Presented:

A.  Should the trial court have entered a judgment notwithstanding the verdict in favor of [Dr.] Crisci because [Appellee] failed to prove, by competent and sufficient evidence, her prima facie case of negligence against her?

B.  Whether the trial court erred in denying Appellants' Motion for a Non-Suit?

C.  Whether the trial court erred in denying a new trial on the basis of highly inflammatory and unfairly prejudicial statements made by Co-[Appellants'] radiology expert, Hani Abujudeh, M.D.?

D.  Whether the trial court abused its discretion and/or made an error of law in permitting [co-Appellants'] radiology expert, Hani Abujudeh, M.D., to testify to issues relating to the standard of care of Dr. Crisci, beyond the opinions testified to by [Appellee's] expert, which resulted in prejudice to Dr. Crisci?

E.  Whether the trial court committed an abuse of discretion and/or an error of law in only granting in part the Motion in Limine filed by Crisci to preclude [Appellee's] expert, Vartan Igidbashian, D.O., from testifying to causation issues outside his expertise?

F.  Whether the trial court committed an abuse of discretion and/or an error of law in denying a new trial because of improper statements made by [Appellee's] counsel?

G.    Whether the trial court committed an abuse of discretion and/or an error of law in denying Appellants' Motion for Post-trial relief on the basis that statements made by [Appellee's] counsel, in disregard of the [c]ourt's ruling on subsequent remedial measures, were highly and unfairly prejudicial to [Appellants]?

H.    Whether the trial court committed an abuse of discretion and/or an error of law in denying Appellants' Motion for Remittitur because [Appellee] failed to introduce sufficient evidence to support the Jury's unreasonable award of damages?

I.    Whether the trial court abused its discretion and/or made an error of law in denying Appellants' Motion for a New Trial on damages since the verdict was against the weight of the evidence?

Brief of Appellants at 1-2.

In its brief, AMH sets forth the following Statement of the Questions

Involved:

1. Whether this Court should grant a new trial on the basis that the trial court allowed [Appellee] to vigorously cross-examine a defense expert using industry guidelines, but where there was no foundation for the guidelines' applicability to the medical treatment at issue, and where this Court and the Supreme Court have repeatedly rejected the trial court's rationale that the Defendant should be made to rebut the improperly admitted evidence with cross-examination.

2. Whether this Court should grant a new trial on the basis that the trial court allowed [Appellee] to introduce an adverse event notification letter, required by the Medical Care and Reduction of Error Act, in violation of the statute's express prohibition on using such letters as admissions of liability, where the letter introduced during testimony that it was an acknowledgement of the "truth" after several hours of lies.

3. Whether this Court should grant a new trial on the basis that the trial court allowed [Appellee's] expert to substantiate an opinion with analysis that is not within the fair scope of his report,

thus lending credibility to his opinion that may have affected the verdict.

4. Whether this Court should vacate the judgment and grant a j.*n.o.v.*, or else remand for a new trial, because the evidence failed to establish the elements of causation and notice, or else the verdict was against the clear weight of the evidence on these points.

5. Whether this Court should remand for a new trial or else vacate the judgment and grant a j.*n.o.v.*, because the verdict concerning the taking of the x-rays by the technologist was against the weight of the evidence, or else was unsupported by necessary, competent, and qualified expert testimony.

6. Whether this Court should, in this rare case, grant a new trial on damages or a remittitur, because the gross verdict amount shocks the conscience, and the factors analyzed for such an argument preponderate heavily in favor of reducing the award.

Brief of AMH at 5-6.

For ease of discussion, we first will consider the claims raised by Dr. Crisci and RGA and thereafter discuss those asserted by AMH. Where issues within each discussion are related, we will analyze them together.

Initially, Dr. Crisci and RGA assert the trial court erred in failing to grant their motion for judgment notwithstanding the verdict (JNOV) due to Appellee's failure to present competent evidence to support her negligence claim. Dr. Crisci and RGA also claim they are entitled to JNOV due to the trial court's failure to grant their motion for a partial nonsuit on the issue of whether Dr. Crisci breached the standard of care in her interpretation of the thoracoabdominal x-ray of December 3, 2008. In doing so, they stress that while Dr. Igidbashian testified Dr. Crisci had breached the necessary standard of care when she did not order an additional study of the victim's chest upon

- 7 -

realizing an abdominal study had been done, he did not testify that there had been a breach in the standard of care with regard to Dr. Crisci's interpretation of the actual study performed. Brief of Dr. Crisci and RGA at 13-14. Dr. Crisci and AMA reason that:

> [i]f Dr. Crisci read the study within the standard of care, the issue of whether another study should have been ordered was moot and should never have been considered by the jury. Without any testimony regarding a breach of the standard of care in the interpretation of the x-ray by Dr. Crisci, [Appellee] failed to satisfy her burden of proving a prima facie case of negligence and therefore, JNOV must be entered in Crisci's favor.
>
> ***
> It was <u>imperative</u> to the defense for the trial court to have granted Dr. Crisci's partial motion for non-suit so that the jury would not consider the issue of whether Dr. Crisci breached the standard of care in interpreting the x-ray.

*Id*. at 14-15, 20 (emphasis in original).

At the outset, we note that where a defendant presents evidence following the denial of a motion for nonsuit, the correctness of the trial court's denial is rendered a moot issue and unappealable. *See Williams v. A–Treat Bottling Co, Inc.*, 551 A.2d 297, 299 (Pa.Super. 1988). Here, Dr. Crisci and RGA raised a motion for partial nonsuit at the close of Appellee's case which the trial court denied. *See* N.T. Trial, 5/11/16, at 222-24. However, Dr. John Kirby testified as a witness for Dr. Crisci following the denial of the nonsuit. *See* N.T. Trial, 5/12/16 a.m., at 95-136; N.T. Trial 5/12/16 p.m., at 1-14. Accordingly, the propriety of the court's order is a moot issue, *Williams*, 551

A.2d at 299, and we next consider the trial court's denial of their motion for JNOV. In doing so, we employ a well-settled standard of review:

> A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the [court] could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

*V–Tech Services, Inc. v. Street*, 72 A.3d 270, 275 (Pa.Super. 2013) (citation omitted).

Medical malpractice is defined broadly as the "unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services." *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 573 Pa. 245, 254, 824 A.2d 1140, 1145 (2003). "[T]o prevail in a medical malpractice action, a plaintiff must 'establish a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of the harm.'" *Id.* (quoting *Hightower–Warren v. Silk*, 548 Pa. 459,

698 A.2d 52, 54 (1997). Thus, the basic elements of medical malpractice and ordinary negligence are the same, although medical malpractice has some distinguishing characteristics. *See Grossman v. Barke*, 868 A.2d 561, 566 (Pa.Super. 2005).

Upon our review of the trial testimony, we agree with Dr. Crisci and RGA that Dr. Igidbashian did not opine Dr. Crisci had deviated from the standard of care by misinterpreting the x-ray she reviewed on December 3, 2008. However, it was not her "alleged misinterpretation" of that x-ray which was highlighted to the jury as being "a cause or a substantial factor in bringing about Mr. Summerford's injury and death" as Dr. Crisci and RGA opine in their appellate brief, *see* Brief of Appellants at 19, but rather her failure to seek an additional study to achieve a proper diagnosis which was represented as constituting a deviation from that standard of care. As such, Dr. Crisci's analysis of an incomplete study was not determinative in deciding Appellee's medical malpractice claim. In this regard, the trial court reasoned as follows:

> At trial, Dr. Vartan Igidbashian, [Appellee's] expert radiologist, testified that the end/tip of the feeding tube was supposed to terminate in Mr. Summerford's stomach and not his lung.[6] He testified that he could not determine based on the December 3rd x-ray alone whether or not the feeding tube was actually in Mr. Summerford's stomach:
>
> **MR. TRUNK:** That's the end of the feeding tube, correct?
>
> **DR. IGIDBASHIAN:** Correct.
>
> **Q.** Where is that supposed to be located?
>
> **A.** That's supposed to be located in the stomach.

- 10 -

**Q.** Can you tell from this image whether that is in the stomach or not?

**A.** No.

N.T. 05.10.16 (a.m.), p. 90-91.

Dr. Igidbashian stated that Dr. Crisci breached the standard of care by interpreting this x-ray instead of obtaining additional views:

**MR. TRUNK:** And what should Dr. Crisci, the radiologist who reviewed this film, have done when she saw that an abdominal study was taken to check the placement of a feeding tube?

**DR. IGIDBASHIAN:** She should have asked for additional views to include the chest, the major airway, so that you can make sure that the tube is not going through those and ending up in the lung, instead of coming through and ending up in the stomach.
**Q.** Did she do that?

**A.** No.

**Q.** And was that a violation of the standard of care?

**A.** Yes.

N.T. 05.10.16 (a.m.), pp. 92-93.

Dr. Igidbashian opined that Dr. Crisci was incorrect in concluding that the December 3rd study confirmed the feeding tube terminated in Mr. Summerford's stomach:

**MR. TRUNK:** And then the conclusion [of Dr. Crisci] is: Feeding tube terminates within the stomach. Is that a conclusion that a radiologist would be able to reach by looking at the image, the abdominal study, that we just saw?

**DR. IGIDBASHIAN:** No.

- 11 -

**Q.** And was this the correct conclusion? The conclusion is that you cannot tell.

**Q.** Was this the correct conclusion that Dr. Crisci reached?

**A.** No.

**Q.** Why is that?

**A.** Because you cannot tell where it is exactly.

**Q.** And where was the feeding tube?

**A.** It was in the lung.

N.T. 05.10.16 (a.m.), pp. 97-98.

**MR. TRUNK:** You told us earlier that Dr. Crisci should have -- when she saw that study on December 3rd, she should have recognized that it was an abdominal study, and she should have ordered another study. Did I get that right?

**DR. IGIDBASHIAN:** Yes.

**Q.** Did she do that?

**A.** No.

**Q.** Was that a breach of the standard of care?

**A.** Yes.

**Q.** And did that failure increase the risk of harm to Mr. Summerford?

**A.** Yes.

N.T. 05.10.16 (a.m.), pp. 136-137.

The expert testimony at trial was sufficient for the jury to find that Dr. Crisci violated the standard of care by her failure to order another study to make sure the feeding tube was in Mr. Summerford's stomach and not his lung. The court properly denied Dr. Crisci's motion for a non-suit because the evidence was

sufficient for a jury to determine that Dr. Crisci was liable to [Appellee].

Dr. Crisci claims she is entitled to judgment *n.o.*v. or a new trial because Dr. Igidbashian failed to testify that Dr. Crisci, "breached the standard of care in her interpretation of the thoracoabdominal x-ray performed on December 3, 2008." Crisci Post-Trial Motion, 3. In support of this argument, Dr. Crisci asserts: "Dr. Igidbashian testified that it was a breach of the standard of care for Dr. Crisci not to have ordered a new study; however, Dr. Igidbashian did not testify that there was a breach in the standard of care with regard to the interpretation of the study itself." *Id.*

At the conclusion of Plaintiffs case-in-chief, Dr. Crisci made the following oral motion for a partial non-suit:

**MS. RAYNOR (Counsel for Crisci):** Your Honor, now that [Appellee] has closed her case, I would like to make a partial motion for nonsuit on the basis that, as I understand [Appellee's] claims, there were two.

Number 1, that Dr. Crisci misread an x-ray, which has been conceded and that she failed, allegedly failed to recognize it was a bad study from a technical perspective and ask for another study.

[Appellee's] expert, Dr. Igidbashian, testified that she breached the standard of care on only one of those pieces, which was not appreciating that it was not the proper study, and ordering another study that would better capture the anatomy.

He did not state that she breached the standard of care by making an error, a mistake, and I think for that piece of it to go to the jury as -- he would have had to have given that testimony, and he did not.

**THE COURT:** Okay. Do you want to respond to that?

**MR. TRUNK (Counsel for [Appellee]):** He actually did give that testimony, and the testimony was that there was a breach of the standard of care to incorrectly interpret the study, and as well as to not ask for a new study.

**THE COURT:** Okay.

- 13 -

**MS. RAYNOR:** Your Honor, if l may say, I specifically asked him on recross, to be clear, that his own only claim of the breach of the standard of care was that she did not ask for another study for interpretation.

**X X X**

**THE COURT:** Okay. I'm going to deny the motion.

N.T. 05.11.16 (p.m.), pp. 222-224.

In *Montgomery v. S. Philadelphia Med. Group, Inc.,* 656 A.2d 1385 (Pa. Super. 1995), the Superior Court explained: A motion for a non-suit may be granted only where it is clear that no other conclusion could be reached under the evidence presented. *Bowser v. Lee Hosp.,* 399 Pa.Super. 332,337,582 A.2d 369,371 (1990), *allocatur denied,* 527 Pa. 614,590 A.2d 755 (1991); *A.J Aberman, Inc. v. Funk Bldg. Corp.,* 278 Pa.Super. 385,393,420 A.2d 594, 598 (1980). When considering such a motion, issues of credibility and the weight to be assigned to the evidence are not to be resolved by the trial judge, but must be left for the finder of fact to resolve at the close of the evidence. *Scott v. Purcell,* 490 Pa. 109, 113,415 A.2d 56, 58 (1980). Because a jury may not reach its verdict on mere speculation, however, a trial court may enter a non-suit if the plaintiff has failed to produce sufficient evidence to meet his or her burden of proof. *Morena v. South Hills Health Sys.,* 501 Pa. 634,462 A.2d 680, 683 (1983).

*Montgomery,* 656 A.2d at **1388.**

Dr. Crisci is correct that Dr. lgidbashian did not offer an expert opinion that she violated the standard of care by misinterpreting the x-ray on December 3, 2008. His criticism of her care was limited to her failure to recognize the December 3, 2008 x-ray was inadequate and failing to order an additional x-ray to confirm placement of the feeding tube.

It is of no moment that the court denied Dr. Crisci's motion for a partial non-suit regarding an unproven claim. If erroneous, this ruling had no effect whatsoever regarding the admission of any evidence at trial or the court's charge to the jury at the conclusion of the case. It is not the court's practice to instruct the jury regarding the theories of liability or the defenses to liability but, instead, to instruct the jury that they must weigh the credible

evidence and apply the law charged by the court in order to determine whether plaintiff satisfied her burden of proof or not. [7] "Where a case is submitted to a jury on several theories which have been pleaded in the alternative, the verdict can be upheld if the evidence is sufficient to prove a valid cause under any of those theories." *Niles v. Fall Creek Hunting Club, Inc.,* 545 A.2d 926, 931 (Pa.Super. 1988).

_____

[6] The tip of the feeding tube is denser, and thus brighter, so that it can more easily be identified by x-ray.

[7] Dr. Crisci did not request a limiting instruction that the jury should not consider Dr. Crisci's misinterpretation of the x-ray as a basis for liability.

Trial Court Opinion, filed 12/29/16, at 6-11.

Viewing the foregoing evidence presented at trial in a light most favorable to Appellee as we must, we find it was sufficient to sustain the verdict. As such, we affirm the trial court's decision to deny the motion for JNOV.

In their third and fourth issues, Dr. Crisci and RGA challenge certain testimony of Dr. Hani Abujudeh, an expert in radiology, presented by AMH. Counsel for Appellee asked Dr. Abujudeh on cross-examination whether a first-year resident would be able to identify the path of the feeding tube from the image presented on the December 3, 2008, x-ray. Over objection, Dr. Abujudeh responded as follows:

> **Q**. Could a first year resident tell on the image from December 3rd, 2008?
>
> **Ms. Raynor:** Objection, that's beyond the scope of his report, and he's asking for a standard of care opinion.
>
> **The Court:** Overruled. Go ahead.

- 15 -

**Q.** Could a first year resident determine on that x-ray that Dr. Crisci misinterpreted that the course of the feeding tube is misplaced and goes into the lungs and not the stomach?

**A.** Yes. In fact, the jury can also tell right now, based on education that I gave them, that is the wrong place, not just a first year resident.

**Q.** A first year resident, and even a jury of - - you're assuming that they are not radiologists, I assume, right?

**A.** Right, based on experience that they have explored, you can see that the first one is going down this way, and the second one is going down on the same path.

**Q.** And that's because that was a superb film to see, right?

**A.** Correct.

N.T. Trial, 5/11/16 p.m., at 190-191.

Dr. Crisci and RGA reason that the aforementioned exchange "gave the jury the misinterpretation that that they were more competent and trained to interpret such an x-ray than Dr. Crisci who attended medical school and was the Chair of the Radiology Department at Abington Hospital for years, and that, she was at best, not competent to read the film, or at worst, she was grossly negligent." Brief of Appellants at 24. They further contend a new trial is warranted as this testimony was outside the scope of Dr. Abujudeh's report in violation of Pa.R.C.P. § 4003.4(c) and exceeded the testimony of Appellee's expert as to Dr. Crisci's breach of the standard of care. *Id*. at 27.

When considering whether the trial court had erred in denying an appellant's motion for a mistrial based upon certain remarks of a Commonwealth witness, our Supreme Court generally observed that:

> [e]very unwise or irrelevant remark made in the course of a trial by a judge, a witness, or counsel does not compel the granting of a new trial. A new trial is required when the remark is prejudicial; that is, when it is of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial.

***Commonwealth v. Goosby***, 450 Pa. 609, 611, 301 A.2d 673, 674 (1973) (citations omitted).

Initially, we note that prior to the aforesaid cross-examination, AMH had elicited testimony from Dr. Abujudeh, without a specific objection from Dr. Crisci or any objection from RGA, that a first year resident could observe the feeding tube had entered Mr. Summerford's lung.  N.T. Trial, 5/11/16 p.m., at 159-160, 160-62.  Once that testimony had been given without objection, Appellee properly explored it further on cross-examination.  Furthermore, the record belies Dr. Crisci's and RGA's representation that the aforesaid testimony pertained to the relevant standard of care, for the objection to the specific question concerning whether this was a violation of the standard of care was sustained, and Dr. Abujudeh did not opine in this regard.  ***See*** N.T. Trial, 5/11/16 p.m., at 192.

Also, to the extent Appellants challenge Dr. Abujudeh's surmising as to what a juror could observe as minimizing Dr. Crisci's credentials, we note that

Appellants failed to raise this argument at the proper juncture before the trial court; therefore, it is waived.

> [I]n order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error, such as an erroneous jury instruction, will result in waiver of that issue. On appeal, the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected.... By specifically objecting to any obvious error, the trial court can quickly and easily correct the problem and prevent the need for a new trial. Additionally, the appellate court should not be required to waste judicial resources correcting a problem that the trial court could have easily corrected if it had been given the opportunity to avoid the necessity of granting a new trial.

*Fillmore v. Hill*, 665 A.2d 514, 515–16 (Pa.Super. 1995), *appeal denied*, 674 A.2d 1073 (Pa. 1996) (citations omitted); Pa.R.A.P. 302(a).

In addition, as the trial court notes, Dr. Abujudeh's testimony was relevant to a key and contested issue concerning the quality of the December 3, 2008, x-ray. As the trial court explained:

> It is important to review the evidence introduced in the trial record before Dr. Abujudeh's testimony regarding a central issue in the case -the quality of the December 3rd x-ray. Dr. Igidbashian had already testified that it was below the standard of care for Dr. Crisci to rely upon the December 3rd x-ray because, *inter alia,* there was inadequate visualization of the feeding tube, chest and major airway. N.T. 05.10.16 (a.m.), pp. 92-98. Dr. Crisci had earlier testified that the x-ray film was of good diagnostic quality (N.T. 05.10.16 (p.m.), p. 94), but acknowledged that she had misread the study:
>
> **BY MR TRUNK:**

**Q.** That is, if you thought that the tube was coming this way out of the esophagus, and we now know that's not where it was coming out of, correct?

**A.** Yes, absolutely.

**Q.** So that means you were never able to visualize the tube going from what you thought was the area of the spine over to the left where we see it here, correct?

**A.** Yes. I made a mistake in the interpretation of the film. That is correct.

**Q.** And in other words, you could not see the full course of this tube?

**A.** I could not see the full course of the. tube.

N.T. 05.10.16 (p.m.), p. 103.

A pivotal and contested issue in this case related to the quality of the x-ray taken on December 3, 2008[,] and whether it captured the appropriate anatomy. Dr. Igidbashian testified that its quality was not adequate to make a diagnosis and that the standard of care required that an additional study be ordered. N.T. 05.10.16 (a.m.), pp. 92-93. Dr. Crisci testified that the diagnostic quality of the image itself was good, but that in hindsight, she could not see some of the anatomy needed to make a correct interpretation. N.T. 05.10.16 (p.m.), p. 94. Dr. Abujudeh testified that the quality of the study was so good that even lay people could see what the image showed. N.T. 05.11.16 (p.m.), p. 191-192. His testimony did not relate to the standard of care, but to the quality of the image. The court properly sustained the objection to a question eliciting a standard of care opinion by Dr. Abujudeh. His testimony was probative and relevant to the issue relating to the quality of the subject x-ray which was misinterpreted and whether another study was indicated. Dr. Abujudeh never testified that Dr. Crisci violated the standard of care.

Trial Court Opinion, filed 12/29/16, at 13-14.  For all of the foregoing reasons, these issues lack merit.

Dr. Crisci and RGA next submit the trial court erred and abused its discretion when it only partially granted their motion *in limine* to preclude Appellee's expert Dr. Igidbashian from testifying to causation issues that allegedly exceeded his expertise. They maintain that as a radiologist, Dr. Igidbashian did not possess the necessary training and experience to provide competent trial testimony pertaining to internal medicine and forensic pathology. Brief of Appellants at 31. Dr. Crisci and RGA further represent that "Dr. Igidbashian was permitted to testify that Dr. Crisci increased the risk of harm by not ordering another radiology study. He was simply not qualified to offer causation opinions, as was confirmed by his own acknowledgement during his testimony at trial that he had never interpreted an x-ray taken to confirm feeding tube placement and had never determined the cause of death of anyone." *Id*. at 35. They conclude that the subject testimony "prejudiced Dr. Crisci in that the jury considered evidence on causation that it should never have considered and may have reached its verdict based upon his testimony." *Id*.

The referenced testimony was developed as follows:

> **Q.** You told us earlier that Dr. Crisci should have –when she saw that study on December 3rd, she should have recognized that it was an abdominal study, and she should have ordered another study. Did I get that right?
>
> **A.** Yes.
>
> **Q.** Did she do that?
>
> **A.** No.

**Q.**     Was that a breach of the standard of care?

**A.**     Yes.

**Q.**     And did that failure increase the risk of harm to Mr. Summerford?

**A.**     Yes.

N.T. Trial, 5/10/16 a.m., at 136-37.

This Court's standard of review regarding evidentiary challenges is well-settled:

> [a]dmission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

***Commonwealth v. Tyson***, 119 A.3d 353, 357-58 (Pa.Super. 2015) (internal citations and quotation marks omitted), *appeal denied*, 128 A.3d 220 (Pa. 2015).  An appellant bears a "heavy burden" to show that the trial court has abused its discretion. ***Commonwealth v. Christine***, 533 Pa. 389, 397, 125 A.3d 394, 398 (2015).

In ***Miller v. Brass Rail Tavern***, 541 Pa. 474, 664 A.2d 525 (1995), the Pennsylvania Supreme Court held that a witness without a medical degree who acted in the dual role of mortician and county coroner was competent to give expert testimony as to one's time of death. In doing so, the Court explained:

[i]t is well established in this Commonwealth that the standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine. It is also well established that a witness may be qualified to render an expert opinion based on training and experience. Formal education on the subject matter of the testimony is not required, nor is it necessary that an expert be a licensed medical practitioner to testify with respect to organic matters. It is not a necessary prerequisite that the expert be possessed of all of the knowledge in a given field, only that he possess more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience.

*Id.* 541 Pa. at 480-81, 664 A.2d at 528 (emphasis and internal citations omitted).

Upon our review of the record, we find the trial court did not abuse its discretion in permitting Dr. Igidbashian to opine that the deviations in the standard of care increased the risk of harm to Mr. Summerford. As the trial court reasoned,

[p]rior to trial, Dr. Crisci filed a Motion in Limine to preclude plaintiff's expert, Dr. Igidbashian, from testifying at trial that Dr. Crisci's alleged failures increased the risk of harm to Mr. Summerford and were a substantial factor in causing his death. After argument on May 3, 2016, the court entered an order which stated: "Dr. Igidbashian is permitted to testify that the deviations in the standard of care increased the risk of harm to [Appellee's] decedent. Dr. lgidbashian is precluded from testifying that deviations from the standard of care of Dr. Crisci caused [Appellee's] decedent's death."
Dr. Crisci argues that "only a qualified expert in internal medicine or forensic pathology" could provide credible, competent testimony regarding increased risk of harm or cause of death. Brief in Support of Motion for Post-Trial Relief, p. 13.
Section 512 of the MCARE Act sets forth the standards for medical expert competency in Pennsylvania. As a general rule,

"[n]o person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony." *40 P.S. § 1303.512.*

\*\*\*

Dr. Igidbashian's qualifications as a board certified radiologist with 30 years of experience in the field of radiology qualified him to provide an expert opinion that the misplacement of a feeding tube in plaintiffs decedent's lung increased the risk of harm to the decedent. N.T. 05.10.16 (a.m.), pp. 136-137.

Dr. Crisci's claim of error is undermined by her own acknowledgment that a misplaced feeding tube into a patient's lung could increase the risk of harm to the patient.

**MR. TRUNK:** The reason the placement of a feeding tube is checked by x-ray, doctor, is because there can be harm to the patient if the feeding tube is placed in the wrong area; is that right?

**DR. CRISCI:** There can be some degree of harm to the patient if it is not in the stomach.

**X X X**

**Q.** I asked you if there could be harm to the patient if you placed a feeding tube in the patient's lung. And you responded and qualified it and said that there could be some degree of harm. And I said, some degree of harm? Doctor, it can cause death, can't it? A feeding tube into a patient's lung can cause death.

**A.** It may cause death. It may not cause death. That is correct.

**Q.** But it has the potential to cause death. Can we agree on that?

**A.** It certainly has the potential to cause death, yes.

**Q.** And it has the potential to cause death in multiple ways, doesn't it?

**A.** It has the possibility of causing death in a couple of ways, yes.

N.T. 05.10.16 (p.m.), pp. 74-75.

The court's ruling permitting Dr. Igidbashian to testify regarding increased risk of harm (and not cause of death) was proper.

Trial Court Opinion, filed 12/29/16, at 14-16.

Furthermore, Dr. Crisci and RGA's own arguments in their appellate brief undermine their position that Dr. Igidbashian's testimony was prejudicial to them. Dr. Crisci and RGA stress Dr. Igidbashian indicated he had never made a determination as to one's cause of death and had interpreted no x-rays to confirm placement of an NG tube since 2011. Brief of Appellants at 32-33 *citing* N.T. Trial 5/10/16, at 26, 32. It was within the province of the jury to weigh this testimony as to Dr. Igidbashian's lack of knowledge in this regard which, arguably, undermined his earlier statements at trial concerning Dr. Crisci's failure to order another radiology study. **See Miller, supra**.

In their sixth and seventh issues, Dr. Crisci and RGA maintain the trial court should have granted them a new trial in light of certain statements made by Appellee's counsel. For the reasons that follow, we find these claims waived.

In their concise statement of errors complained of on appeal, Dr. Crisci and RGA generally question "[w]hether the [t]rial [c]ourt committed an abuse of discretion and/or an error of law in denying Appellants' Motion for Post-trial relief on the basis that statements made by [Appellee's] counsel, in disregard of the [c]ourt's ruling on subsequent remedial measures, were highly and unfairly prejudicial to [Appellants]?" **See** Concise Statement filed 10/18/16, at ¶ G. However, in their appellate brief, they raise a challenge to statements

Appellee's counsel made during closing argument pertaining to testimony counsel had elicited on cross-examination of co-defense counsel's expert Dr. Abujudeh. Brief of Appellants at 35-42.

> Pennsylvania Rule of Appellate Procedure 1925 provides that a Rule 1925(b) statement "shall concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge." Pa.R.A.P. 1925(b)(4)(ii). "Issues not included in the Statement and/or not raised in accordance with the provisions of this [Rule] are waived." Pa.R.A.P. 1925(b)(4)(vii). This Court has considered the question of what constitutes a sufficient 1925(b) statement on many occasions, and it is well-established that "Appellant's concise statement must properly specify the error to be addressed on appeal." ***Commonwealth v. Hansley***, 2011 PA Super 129, 24 A.3d 410, 415 (Pa. Super. 2011), *appeal denied*, 613 Pa. 642, 32 A.3d 1275 (2011) (citation omitted). "[T]he Rule 1925(b) statement must be specific enough for the trial court to identify and address the issue an appellant wishes to raise on appeal." ***Id.*** (brackets, internal quotation marks, and citation omitted).

***In re A.B.***, 63 A.3d 345, 350 (Pa.Super. 2013).

Moreover, "[a] theory of error different from that presented to the trial jurist is waived on appeal, even if both theories support the same basic allegation of error which gives rise to the claim for relief." ***Commonwealth v. Ryan***, 909 A.2d 839, 845 (Pa.Super. 2006) (citation omitted), *appeal denied*, 597 Pa. 714, 945 A.2d 768 (2008). Because only claims properly presented before the trial court are preserved for appeal, and Dr. Crisci's and RGA's challenge to counsel's statements in their Rule 1925(b) statement not only were vague but also did not mention closing argument, their contentions in their appellate brief concerning those statements are waived.

We also would find any challenge to statements made by Appellee's counsel waived for Dr. Crisci's and RGA's failure to make a timely and specific objection to the alleged statements on the record. *See Commonwealth v. Yandamuri*, ___ Pa. ____, n.23, 159 A.3d 503, 528 n.23 (2017) (finding challenge to prosecutor's statement during closing argument waived where the appellant failed to demonstrate where in the record he had preserved this claim and the Supreme Court's independent review did not disclose a contemporaneous objection). *See also*, Pa.R.A.P. 2119(e) (requiring an appellant to identify where in the record he preserved an issue for appellate review); *Filmore*, *supra*.

The final two issues Dr. Crisci and RGA present pertain to the $5,000,000 jury award which they argue was excessive, punitive and clearly exceeded what the evidence warrants. Brief of Appellants at 42. In support of this assertion, Dr. Crisci and RGA highlight the following facts from the record:

> In this case, [Appellee] did not submit evidence of economic loss at all. The jury's award was based solely upon a noneconomic award. [Mr. Summerford] was 88 years old at the time of the alleged injury, had suffered multiple comorbidities including dementia, syncope, hypertension, pulmonary insufficiency, congestive heart failure, coronary artery disease, and other maladies prior to his admission to Abington Hospital, and importantly[] [h]e suffered a [c]ode the day prior to the alleged injury which was not related to the alleged injury, which reduced significantly his chances of mortality.
>
> Defense expert, John Kirby, M.D. testified that an 88 year-old person normally has a life expectancy of 4.55 years, but that Mr. Summerford had a zero percent life expectancy before the feeding tube in dispute was placed into Mr. Summerford at AMH.

- 26 -

. . .

A careful review of [Appellee's] testimony reveals that [Appellee] produced very little evidence of the value of loss value of the decedent's life to the family by reason of the death of Mr. Summerford. Mr. Summerford lived in a nursing home in Pennsylvania. [Appellee] lived in California or Georgia for most of her adult life, while her father lived in Norristown, PA. She visited her father whenever she could get to Pennsylvania. She testified that she spoke to him on the telephone several times each week; however, there are notes in Mr. Summerford's nursing home records, asked about at trial, about the lack of family involvement and interest in his care. This is hardly the type of evidence to substantiate such a plainly excessive and exhorbitant [sic] award to [Appellee]. . . .

Brief of Appellants at 45-46 (citations to reproduced record omitted) (emphasis in original).

The grant or refusal of a new trial due to the excessiveness of the verdict is within the discretion of the trial court. This [C]ourt will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice. We begin with the premise that large verdicts are not necessarily excessive verdicts. Each case is unique and dependent on its own special circumstances and a court should apply only those factors which it finds to be relevant in determining whether or not the verdict is excessive.

*Tindall v. Friedman*, 970 A.2d 1159, 1177 (Pa.Super. 2009) (citations omitted), *reargument denied*, June 1, 2009.

Similarly:

Our standard of review from the denial of a remittitur is circumspect and judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant. The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption. Furthermore, [t]he decision to grant or deny remittitur is within the sole discretion of the trial court, and proper appellate review dictates this Court reverse such an Order only if the trial

court abused its discretion or committed an error of law in evaluating a party's request for remittitur. **Renna v. Schadt**, 64 A.3d 658, 671 (Pa. Super. 2013) (citations and quotation marks omitted).

**Tillery v. Children's Hosp. of Philadelphia**, 156 A.3d 1233, 1246–47

(Pa.Super. 2017), *reargument denied*, Apr. 24, 2017, *appeal denied*, No. 227

EAL 2017, 2017 WL 4517582 (Pa. Oct. 10, 2017).

In analyzing these issues, the trial court reasoned as follows:

Wrongful Death Action

Wrongful death damages are recoverable to compensate the spouse, children, or parents of a deceased for the pecuniary value of losses they have sustained as a result of the death of the decedent. *Slaseman v. Myers,* 455 A.2d 1213, 1218 (Pa. Super. 1983). The value of decedent's services to a decedent's family includes society and comfort. *Machado v. Kunkel,* 804 A.2d 1238, 1245 (Pa. Super. 2002). In *Rettger v. UPMC Shadyside,* 991 A.2d at 915 (Pa. Super. 2010), defendant hospital contended that the jury's award of $2.5 million for the wrongful death claim was excessive where decedent was unmarried, had no children or dependents and provided only limited services in his parents' home on weekends. The court rejected the hospital's argument and held that the term "services" in the context of a wrongful death claim "clearly extends to the profound emotional and psychological loss suffered upon the death of a parent or a child where the evidence establishes the negligence of another as its cause." *Id.* at 933.

[Appellee] offered the following testimony about her relationship with her father:

**[Appellee]:** Yes, we were close. My father was -- my father was everything to me, and I would call him all the time and talk about everything. There wasn't anything that I couldn't talk to my dad about. My dad was understanding. He never condemned me. He always supported me and encouraged me.

N.T. 05.11.16 (p.m.), p. 66.

She testified that prior to her father's death she spoke with him several times each week over the phone. N.T. 05.11.16 (p.m.), p. 48. Regarding the final phone call she had with her father, [Appellee] testified:

**MR. TRUNK:** How did you end the conversation?

**[Appellee]:** We always say one, two, three, because we never liked to hang up.

**Q.** How long is this something you've been doing?

**A.** For years, maybe 40 years. I don't know.

**Q.** How many?

**A.** Fifty years, a long time.

**Q.** Every time you hang up, that's the way you hung up?

**A.** Yes, we always say -- we hang up on the count of three. So we go one, two, three, and we hang up the phone, because neither one of us ever wanted to say goodbye. You know, so that's how we did it, and so I told my dad, I said, I want to call you back, and you know, so he sounded tired.

So I said, well, you rest now, and I'll call you back, I'm going to call you back, and okay, okay. So one, two, three, we hung up.

**Q.** Okay. Now –

**A.** But I promised him I was going to call him back.

N.T. 05.11.16 (p.m.), pp. 81-82.

[Appellee] demonstrated her father's importance to her and her family by introducing family photographs of their time together at her graduation and at other times with her children and grandchildren. N.T. 05.11.16 (p.m.), pp. 59-65. [Appellee] testified she and her sister would rendezvous with her father over the years. N.T. 05.11.16 (p.m.), p. 65. In addition, one of [Appellee's] sons attended high school in Norristown while living for an extended period of time with decedent, and another one of her sons lived with Mr. Summerford for four years while attending

- 29 -

Temple University in Philadelphia. N.T. 05.11.16 (p.m.), pp. 54-55.

This evidence was sufficient to submit to the jury for consideration of damages under the Wrongful Death Act.

'The duty of assessing damages is within the province of the jury' and, thus, as a general matter, a compensatory damage award 'should not be interfered with by the court unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence.' *Gradel v. Inouye,* 491 Pa. 534,421 A.2d 674, 680-81 (1980) (quoting *Tonikv. Apex Garages, Inc.,* 442 Pa. 373,275 A.2d 296,299 (1971)).

*Paves v. Corson,* 801 A.2d 546, 548-49 (Pa. 2002).

The jury's award of $1.5 million is consistent with other Pennsylvania verdicts for wrongful death claims. See, *Rettger, supra; Hyrcza v. W Penn Allegheny Health System, Inc.,* 978 A.2d 961 (Pa. Super. 2009). The court properly denied Dr. Crisci's request for remittitur.

<u>Survival Action</u>

The measure of damages awarded in a survival action includes, *inter alia,* the decedent's conscious pain and suffering. *Kiser v. Schulte,* 648 A.2d 1, 4 (Pa. 1994). Here, the jury awarded decedent's estate $3.5 million as compensation for Mr. Summerford's conscious pain and suffering.

In awarding damages for pain and suffering, a jury may consider, *inter alia,* the severity of the injury, the duration and extent of the physical pain and mental anguish which the decedent experienced, as well as the health and physical condition of the plaintiff prior to the injuries. *See, Pa.R.C.P. 223.3.* The defendant has the burden of convincing the court that the award deviates substantially from what is considered reasonable compensation. *Hyrcza, supra.*

At trial, Dr. Ross testified about Mr. Summerford's conscious pain and suffering he experienced during the night of December 3rd into the morning of December 4th.

**Dr. ROSS:** He's conscious. Throughout the whole time course until his final arrest he was conscious. Haldol, Ativan is kind of a sedative that's given. That is lorazepam. In addition, he was becoming increasingly tachycardic. His heart is pounding. It's pounding in his chest. Tachypnea is 40 to 50 breaths. He's huffing and puffing. He's breathing a lot because the fluid is building up in his left lung and he's becoming short of breath.

**MR. TRUNK:** What was his breath rate before the crux of the feeding solution started on the night of the 3rd into the morning of the 4th?

**A .** ... He started becoming short of breath. Short of breath because of the suffocation; he's having difficulty breathing. The work that he's doing, work of breathing, is becoming more and more labored, more and more difficult.
...
He continued to decline. He was tachypneic. His accessory muscles, we breathe with our diaphragms but we also use our intercostal muscles, your rib muscles. So he's just huffing and puffing trying to breathe, short of breath. Then he was intubated, and in time over the next hour his heart rate went down. He was having more and more difficulty breathing, then he had a cardiac arrest.

**Q.** Doctor, all the things you described, were they caused by the feeding solution building up in Mr. Summerford's left lung?

**A.** Yes.

**Q.** Are the things that you described, would you consider that to be suffering?

**A.** Yes. He was suffering, yes.

**Q.** Relating to what we talked about earlier, a drowning victim, how, if at all, does this relate to a drowning victim?

**A.** Well, the fluid built up in the lungs makes somebody more and more short of breath. They are experiencing feelings of suffocation, agitation, pain. The wheezing, the course [sic] breaths, trying to cough, all that sort of stuff

- 31 -

produces more and more pain and suffering, just like a drowning.

**X X X**

**Q.** First let's get a time on this note, which is just above. This is a note timed at 12/4/08, 7:51 a.m. Is that after Mr. Summerford had already passed?

**A.** Yes.

**Q.** Now let's go down to the note below that. We read Dr. Bonica's note. This is a nursing note now, doctor, from an R.N. Jessica Schonewolf, correct?

**A.** Yes.

**Q.** And the same thing as you were doing with Dr. [ ] Bonica's note, but tell the jury what, if any, significance what she says were the symptoms Mr. Summerford was experiencing, how it relates to causing death and/or his pain and suffering.

**A.** Yes. "Patient with increased restlessness." That's feeling agitated, feeling restless, feeling bad. Tachypnea, breathing excessively, huffing and puffing. Lethargy. He's kind of running out of steam and energy. Lopressor and Ativan are kind of sedatives to give him. He was given a nebulizer. That will open up some of your airways, especially when they tend to collapse when the fluid gets around them. Then a chest x-ray was completed and lasix given as well.

**Q.** Are those things evidence of -- first of all, are those things related, everything that you read there, related to the feeding solution being in his lung?

**A.** Yes.

**Q.** Are they further evidence of Mr. Summerford unfortunately having experienced pain and suffering before he passed?

**A.** Yes.

N.T. 05.10.16 (p.m.), pp. 40-47.

"The determination of the amount to be awarded for pain and suffering is primarily a jury question." *Gunn v. Grossman,* 748 A.2d 1235, 1241 (Pa. Super. 2000); *see also, Whitaker v. Franliford Hosp. of City of Philadelphia,* 984 A.2d 512 (Pa. Super. 2009).

Dr. Crisci argues the trial court erred by failing to grant remittitur, claiming the jury verdict was so excessive as to deviate substantially from reasonable compensation and shock the conscience of the court.

> The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption. Furthermore, [t]he decision to grant or deny remittitur is within the sole discretion of the trial court, and proper appellate review dictates this Court reverse such an Order only if the trial court abused its discretion or committed an error of law in evaluating
> a party's request for remittitur.

*Gurley v. Janssen Pharm., Inc.,* 113 A.3d 283,294 (Pa. Super. 2015), *reargument denied* (May 19, 2015). A verdict will not be found to be excessive, "unless it so grossly excessive as to shock our sense of justice." *Hyrcza, supra,* 978 A.2d at 979.

The court did not find that the verdict was excessive or shocking. Plaintiff produced expert testimony from Dr. Ross about the suffering Mr. Summerford endured during the night of December 3rd into the morning of December 4th. Dr. Ross described Mr. Summerford as conscious throughout the course of the night, during which time Mr. Summerford became increasing tachycardic, began huffing and puffing due to fluid building up in his lungs, started wheezing, became short of breath due to suffocation, and eventually suffered cardiac arrest. As stated above, Dr. Ross described Mr. Summerford's death as just like a drowning ("[Mr. Summerford was] experiencing feelings of suffocation, agitation, pain. The wheezing, the course [sic] breaths, trying to cough, all that sort of stuff produces more and more pain and suffering, just like a drowning.") N.T. 05.10.16 (p.m.), p. 43.

Dr. Crisci did not convince the court that the verdict deviated substantially from what is considered reasonable

compensation. *Hyrcza, supra.* There is no evidence that strongly suggests the jury was influenced by passion or prejudice. Accordingly, the court did not err by refusing to grant Dr. Crisci's request for a new trial on damages or remittitur.

Trial Court Opinion, filed 12/29/16, at 27-33.

Based on the foregoing, and following an independent review of the record, we find that the jury's $1.5 million award for Appellee's wrongful death claim and its $3.5 award for Mr. Summerford's conscious pain and suffering caused by the negligence of Dr. Crisci and RGA fell "within the uncertain limits of fair and reasonable compensation." **Renna v. Schadt**, 64 A.3d 658, 671 (Pa.Super. 2013). Therefore, "[c]ognizant of the fact that the amount of pain and suffering damages is primarily a jury question," we agree with the trial court that the verdict was not "so grossly excessive as to shock our sense of justice." **Renna**, **supra** at 671-72 (citation omitted); **Tindall**, **supra** at 1177. Hence, the trial court did not abuse its discretion in denying Appellants' request for a new trial or remittitur on this basis. **See Renna**, **supra** at 671; **Tindall**, **supra** at 1177.

Finding no merit to the issues raised by Dr. Crisci and RGA, we next turn to a consideration of the questions AMH presents for our review in its appellate brief.

AMH first asserts it is entitled to a new trial due to the trial court's allowing Appellee to cross-examine a defense expert using industry guidelines in contravention of precedent from this Court and the Pennsylvania Supreme Court which rejected the trial court's rationale that a defendant must be made

to rebut improperly admitted evidence with cross-examination. While AMH presented ten issues in its concise statement of matters complained of on appeal, it has raised and developed this particular issue for the first time in its appellate brief. [1] Because only claims properly presented

_____

[1] AMH sets forth the following claims in its Statement of Matters Complained of on Appeal filed on September 29, 2016:

> 1.    Failing to grant a judgment *n.o.v.*, or at a minimum a new trial on all issues, where the verdict against [AMH] on the corporate negligence claim is unsupported by sufficient evidence, or was at a minimum against the weight of the evidence. The claim that the Hospital should have had a policy regarding chest x-rays to confirm placement of feeding tubes could not as a matter of law support a corporate negligence claim where a chest x-ray was ordered here, and thus any claimed lack of a policy could not have caused harm. Moreover, the undisputed evidence showed that co-Defendant Dr. Crisci did not request an additional x-ray, and simply misinterpreted the existing x-ray.
> 2. Failing to grant a judgment n.o.v., or at a minimum a new trial on all issues, where the verdict against the [AMH] on the vicarious liability claim, for the x-ray study taken by Jillian Nickel, is unsupported by sufficient evidence, or at the very least is against the weight of the evidence. Given the undisputed testimony, including that introduced by the Plaintiff's expert and elicited by the Plaintiff's counsel, no two reasonable minds could disagree that the conduct of Ms. Nickel in obtaining the December 3 x-ray was not a breach of the standard of care.
> 3. Failing to grant a judgment n.o.v., or at a minimum a new trial on all issues, because Dr. Igidbashian lacked the necessary competence, qualifications, and experience to testify as an expert with respect to [AMH's] policies,
> 4. Failing to grant a judgment n.o.v., or at a minimum a new trial on all issues, because Dr. Igidbashian's opinion was based upon improper and inadmissible hearsay testimony regarding [AMH] policies.
> 5. Failing to grant a judgment n.o.v., or at a minimum a new trial on all issues, because Dr. Igidbashian's testimony that [AMH]

should have had a policy requiring radiology technologists to perform chest x-rays to confirm feeding tube placement, and Dr. Igidbashian's testimony regarding an x-way [sic] performed in August 2008, were both well beyond the fair scope of his report.

6. Failing to grant a judgment n.o.v., or at a minimum a new trial on all issues, because Dr. Igidbashian lacked the necessary competence, qualifications, and experience to testify as an expert with respect to the conduct of radiology technician Jillian Nickel.

7. Failing to grant a new trial where two essential witnesses and employees of [AMH], Jillian Nickel and Joan Diaz, were erroneously and improperly sequestered, resulting in unfair prejudice to [AMH] in its preparation of and presentation of its defense.

8. Failing to grant a new trial where the Court improperly admitted evidence of (a) subsequent remedial measures regarding the x-ray system, (b) improper cross-examination evidence from Dr. Hani Abujudeh regarding standard of care, (c) irrelevant 2014 policies from the American College of Radiology, (d) the December 9, 2008 disclosure/apology letter, (e) impermissibly speculative testimony from codefendant's expert, Dr. Kirby, regarding an intubation on December 2, 2008 as a possible alternative explanation for death, (f) improper hearsay opinions of Dr. Breckenridge, and/or (g) irrelevant statements from Dr. Igidbashian regarding policies of a different hospital, St. Francis (which also were not previously disclosed).

9. Failing to grant a new trial where this [c]ourt improperly precluded [AMH] from introducing evidence, through Dr. Kane, about the Hospital's policies.

10. Failing to award a new trial on damages, or at the very least a remittitur, where the verdict was against the weight of the evidence, and was shockingly excessive as a matter of Pennsylvania common law and also under the MCARE Act, 40 P.S. §1303.515(a), was clearly punitive in nature, bears no resemblance to the damages proven, and so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake or corruption.

before the trial court are preserved for appeal, we find this claim waived. *See*, *In re A.B.*; *Commonwealth v. Ryan*, *supra*.

For the same reason, we find AMH has waived its second claim, because it has raised and developed a different theory of relief in its appellate brief than that it presented to the trial court in its concise statement. In its Statement of Matters Complained of on Appeal, AMH averred the trial court erred in "[f]ailing to grant a new trial where [it] improperly admitted evidence of" … (d) the December 9, 2008[,] disclosure/apology letter[.]" *See* Statement of Matters Complained of on Appeal at 3, ¶8(d), *supra*. However, in its appellate brief AMH avers that the introduction of the letter violated the Medical Care and Reduction Error Act's express prohibition on using such letters as admissions of liability. *See* Brief of AMH at 5, ¶ 2. Appellant made no mention of the applicability of the Act in its concise statement, but rather generally challenged it as "improperly admitted evidence." Moreover, at trial, the basis for AMH's objection to the admission of the evidence was that it was "misleading" and "prejudicial to the defense" *See* N.T. Trial, 5/11/16, at 93.[2]

---

[2] To the extent the issues AMH set forth in its concise statement may be deemed sufficiently specific to preserve this claim for appellate review, we note that after the trial court indicated it was overruling AMH's objection, it stressed that:

> . . . I do not believe its construed to be an admission. There is - - it does state, as follows: In accordance with that law, we are sending you this letter to formally inform you that an x-ray relating to the placement of your father's feeding tube may have

Next, AMH submits this Court should grant a new trial in light of the trial court's allowing Dr. Igidbashian, Appellee's expert in radiology, to testify regarding an x-ray of Mr. Summerford taken on August 22, 2008, although this opinion testimony had not been contained within the fair scope of the

---

been incorrectly read, and in the context of how this case has developed, particularly the defense, it does not appear to be a contested issue by the defense that the x-ray in question was incorrectly read, and so I'm going to admit it.

I did state, off the record, that if the hospital's attorney wishes to submit a supplemental requested point for charge that would address that issue, I would certainly take it under consideration.

N.T. Trial, 5/11/16, p.m. at 93-94.

The trial court's interpretation of the letter's contents as well as its readiness to entertain a supplemental point for charge seemingly resolved AMH's objection for, in response, counsel did not renew her objection, but rather replied "Okay. Thank you." *Id*. at 94. As a result, AMH also has failed to preserve this issue for failure to properly object on the record at trial. *See Commonwealth v. Yandamuri, supra*.

Notwithstanding, the trial court did instruct the jury as to the letter's import and informed it that the notification did not constitute an admission of liability pursuant to the supplemental charge AMH provided:

A medical facility, through an appropriate designee, shall provide written notification to a patient affected by a serious event or, with the consent of a patient, to an available family member or designee, within seven days of the occurrence or discovery of a serious event. **Notification shall not constitute an acknowledgement or admission of liability**.

N.T., 5/13/16 at 119; N.T., 5/12/16 p.m. at 96-97 (emphasis added). Juries presumably follow the trial court's instructions. *Commonwealth v. Cash*, 635 Pa. 451, 471, 137 A.3d 1262,1273 (2016), *cert. denied*, 137 S.Ct. 1202, 197 L.Ed.2d. 249 (2017). There is no indication in the record that the jury did not do so herein.

expert report he prepared and Appellee disclosed prior to trial. AMH Brief at 31-32.

By way of background, on direct examination, Dr. Igidbashian utilized an image to illustrate his testimony regarding the manner in which a proper radiologic study can reveal whether a nasogastric feeding tube mistakenly has been placed in the lung. NT. 5/10/16, a.m. at 72-75. Dr. Igidbashian explained that because the trachea and the lung are very close to each other anatomically, the tube occasionally and inadvertently may get lodged in the lung during insertion. *Id*. at 75. For this reason, a chest x-ray of the upper abdomen, which also encompasses both lungs, allows one to view the whole course of the tube and to discern whether the tube has taken the proper course from the esophagus into the stomach. *Id*. at 75-76.

Thereafter, counsel for Appellee showed Dr. Igidbashian a chest x-ray that included the upper abdomen. This image of Mr. Summerford was taken during his stay at AMH on August 22, 2008, and its purpose was to check the feeding tube placement. *Id*. at 78-81. AMH objected to testimony concerning this study as beyond the scope of Dr. Igidbashian's expert report. *Id*. at 82. The trial court overruled the objection and in doing so reasoned it is "foundational and history." *Id*. at 82. Dr. Igidbashian then proceeded to testify regarding the placement of the feeding tube shown on the August 22, 2008, x-ray and opine that it had been inserted properly. *Id*. at 83-85.

In its brief, AMH reasons that the testimony surrounding the August 22nd x-ray at trial and Dr. Igidbashian's comparisons of it with Mr. Summerford's December 3rd x-ray, coupled with the reference of Appellee's counsel to the earlier report during closing argument, constitute an unfair and surprise use of the evidence and show that it may have affected the verdict. Brief for AMH at 31, 34. AMH also contends that in overruling the objection on the basis that it was "foundational and history," the trial court abused its discretion by raising *sua sponte* an argument not raised by a party. ***Id***. at 32-33.

We previously reiterated our well-settled standard of review regarding evidentiary challenges. When considering this issue in its Rule 1925(a) Opinion, the trial court stated the following:

> . . . The front/cover page of Dr. Igidbashian's report contains a list of seven "Reviewed Studies and Accompanying Reports." The first item on the list is "8/22/2008 5:36pm Portable Chest X-ray." Of the seven studies and accompanying reports reviewed, three are identified by specific date and time in the body of the report. The August 22, 2008, is not one of these three. However, the report states: "Other films show different technicians taking different studies to check the placement of feeding tubes, demonstrating lack of appropriate protocols, enforcement of protocols, training, or oversight."
> Igidbashian Expert Report, p. 2,¶ 2.
> Dr. Igidbashian's report makes clear that the August 22, 2008, study was one (out of only four) "other films" that indicated a lack of uniform procedure in the ordering and performance of x-rays to confirm tube placement. Moreover, it was an AMH study, so AMH had access to the image and radiologist's report of same at all times. The reference to AMH's August 22, 2008 study was foundational and part of the patient's history.
> Finally, there was not a discrepancy between the pre-trial report and Dr. Igidbashian's testimony. Dr. Igidbashian referenced the August 22, 2008 study to demonstrate the anatomy and path of a feeding tube. N.T. 05.10.16 (a.m.), pp.

- 40 -

81-85. Dr. Igidbashian's testimony about the August 22, 2008 x-ray supported his position that different technicians took different studies to check the placement of feeding tubes, demonstrating a lack of consistency due to the lack of written protocols. No standard of care testimony was elicited regarding the August 22, 2008 study. There was no discrepancy between his report and his testimony at trial.

Trial Court Opinion, fled 12/29/16, at 47-48.

Upon our review of the trial transcript, we find no abuse of discretion in the trial court's decision to allow Dr. Igidbashian's references to the August 22, 2008, report. As the trial court notes, the discussion concerning the August 22, 2008, x-ray, when read in the context of Dr. Igidbashian's entire trial testimony, did not exceed the scope of his expert report or constitute unfair surprise, but rather served as an illustrative aid for the jury in its understanding of standard medical practice pertaining to radiologic studies taken to confirm the proper insertion of a feeding tube. Furthermore, the August 22, 2008, x-ray was taken at AMA and was contained within Mr. Summerford's medical records which Dr. Igidbashian testified he had reviewed; thus, it cannot be seemed surprising or prejudicial to AMH.

In its fourth claim, AMH requests this Court to vacate the judgment and grant a JNOV or, in the alternative, remand for a new trial because the evidence was both insufficient to establish causation and notice with regard to the corporate negligence claim brought against AMH and against the clear weight of the evidence on these points. AMH reasons that as Dr. Igidbashian opined the standard of care required the ordering of a chest x-ray to confirm

feeding tube placement, and he admitted Dr. Bonica did, in fact, order the x-ray, "the lack of a policy requiring that a chest x-ray be ordered did not and could not have played any causative role whatsoever in this case." Brief of AMH at 35-37. AMH further posits a JNOV should be entered on the corporate negligence claim for AMH's monitoring of Jillian Nickel because the sole reference to AMH's notice of the potential for harm caused by Ms. Nickel's performing improper x-ray studies was responses Dr. Igidbashian provided to Appellee's hypothetical questions at trial. Reasoning that the jury was shown x-rays that Dr. Igidbashian indicated were appropriate prior to the December 3, 2008, x-ray AMH concludes Appellee failed to prove notice, an essential element of her claim. *Id*. at 38-40.

We have set forth our standard of review for a JNOV above and reiterate here our well-settled standard of review of a challenge to the sufficiency of the evidence:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be

considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Mucci*, 143 A.3d 399, 408–409 (Pa.Super. 2016) (citation omitted), *appeal denied*, 168 A.3d 1252 (Pa. 2017).

In the alternative, AMH argues it is entitled to a new trial with respect to the corporate negligence claim as the jury's verdict was against the weight of the evidence. *Id*. at 41-44.[3] This Court has held that "[a] motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict." *Commonwealth v. Rayner*, 153 A.3d 1049, 1054 n. 4 (Pa.Super. 2016) (quoting *Commonwealth v. Widmer*, 560 Pa. 308, 315, 744 A.2d 745, 751 (2000)). Our Supreme Court has described the standard applied to a weight-of-the-evidence claim as follows:

> The decision to grant or deny a motion for a new trial based upon a claim that the verdict is against the weight of the evidence is within the sound discretion of the trial court. Thus, "the function of an appellate court on appeal is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence." An appellate court may not overturn the trial court's decision unless the trial court "palpably abused its discretion in ruling on the weight claim." Further, in reviewing a challenge to the weight of the evidence, a verdict will be overturned only if it is "so contrary to the evidence as to shock one's sense of justice."

---

[3] AMH preserved this challenge to the weight of the evidence by raising it in its Motion for Post-Trial Relief filed on May 23, 2016.

*Commonwealth v. Cash*, 635 Pa. 451, 466-67, 137 A.3d 1262, 1270 (2016) (internal citations omitted). A trial court's determination that a verdict was not against the interest of justice is "[o]ne of the least assailable reasons" for denying a new trial. *Commonwealth v. Colon–Plaza*, 136 A.3d 521, 529 (Pa. Super. 2016) (quoting *Commonwealth v. Clay*, 619 Pa. 423, 432, 64 A.3d 1049, 1055 (Pa. 2013)). A verdict is against the weight of the evidence where "certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Commonwealth v. Lyons*, 833 A.2d 245, 258 (Pa. Super. 2003) (quoting *Commonwealth v. Widmer*, 560 Pa. at 318, 744 A.2d at 751–752).

As this Court recently reiterated, in *Tompson v. Nason Hospital*, 527 Pa. 330, 591 A.2d 703 (1991) the Pennsylvania Supreme Court "adopted the theory of corporate liability, as it relates to hospitals, by holding that the defendant hospital owed a non-delegable duty of care toward a patient of a doctor with staff privileges at the hospital. *Thompson*, 591 A.2d at 707." *Breslin v. Mountain View Nursing Home, Inc.*, 171 A.3d 818, 823 (Pa.Super. 2017). We further observed that the *Thompson* Court:

> adopted an ostensibly novel theory of liability—"corporate negligence"—under which a hospital operating primarily on a fee-for-service basis can be held liable if it breaches the non-delegable duty of care owed directly to the patient to ensure "the patient's safety and well-being" while at the hospital. The Court surveyed the jurisprudence of other states to identify "four general areas" into which a hospital's responsibilities to its patients could be classified: (1) duties to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) duties to select and retain competent physicians; (3) duties to oversee all persons

who practice medicine within the hospital's walls; and (4) duties to formulate, adopt, and enforce adequate rules and policies to ensure quality patient care. Additionally, the ***Thompson*** Court ruled that the hospital owed a non-delegable duty directly to the patient to observe, supervise, or control his/her treatment approved by multiple physicians; to apply and enforce its consultation and monitoring procedures; and to ensure the patient's safety and well-being while at the hospital. ***See Thompson***, 591 A.2d at 705, 707.

***Id***. at 823-24 (citation omitted).

Our review of the record compels our conclusion that the trial court's denial of AMH's sufficiency claim was proper. Viewing the evidence in the light most favorable to Appellee as the verdict winner, we find sufficient evidence to support the conclusions that AMH's failure to formulate and implement appropriate policies and procedures in 2008 regarding chest x-rays was a factual cause of Mr. Summerford's death such that the record contained sufficient evidence of a *prima facie* case of corporate negligence to allow the claim to go to the jury. We also find that AMH's weight-of-the evidence argument lacks merit in that it essentially restates that which it articulated in support of its challenge to the sufficiency of the evidence. Upon our review of the record, we agree with the trial court that as the ultimate fact-finder, the jury properly weighed the evidence and found AMH liable under Appellee's claim of corporate negligence. In doing so, we adopt the sound reasoning of the trial court on these issues:

In *Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991), the Pennsylvania Supreme Court recognized that a hospital can be directly liable for corporate negligence. The Supreme Court explained the concept as follows:

> Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital. This theory of liability creates a nondelegable duty which the hospital owes directly to a patient.

*Id.,* 591 A.2d at 707. Under *Thompson,* a hospital has the following duties:

> (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

*Id.* (citations omitted).

In addition, "[t]o establish a claim for corporate negligence against a hospital, a plaintiff must show that the hospital had actual or constructive knowledge of the defect or procedures that created the harm. *Thompson." Welsh v. Bulger,* 698 A.2d 581,585 (Pa. 1997). Finally, "[t]he plaintiff also must establish that the hospital's negligence was a substantial factor in causing the harm to the injured party." *Id.*

The evidence at trial demonstrated that AMH's failure to formulate, adopt and enforce appropriate written policies and procedures regarding the performance of chest x-rays was a factual cause of the tragic outcome in this case. Dr. Igidbashian explained that AMH did not have a policy in place in 2008 directing the proper study to determine placement of a feeding tube:

> **MR. TRUNK:** Did [AMH] have a policy in place?
>
> **DR. IGIDBASHIAN:** Not that I saw.
>
> **Q.** Did they have any protocols in place?
>
> **A.** Not that I saw.
>
> **Q.** Did the standard of care require that a hospital, like Abington Memorial Hospital in 2008, have a procedure or protocol in place to check the placement of a feeding tube?
>
> **A.** Yes.

N.T. 05.10.16 (a.m.), p. 131.

**X X X**

**Q.** What should a policy or procedure in 2008 have required the study be to check the placement of a feeding tube?

**A.** A chest x-ray to include the upper abdomen.

**Q.** And in that chest x-ray, what part of the anatomy should have been captured or should the policy say should be captured in that study?

**A**. The main airway, the trachea, the lungs, and the esophagus; those should be in there. And you get a portable chest x-ray.

N.T. 05.10.16 (a.m.), p. 133.

Dr. Crisci acknowledged that AMH's x-ray technologist, Jillian Nickel, took an abdominal x-ray and not a chest x-ray as ordered by Dr. Bonica:

**MR. TRUNK:** So, with that in mind, we can agree that the x-ray that Miss Nickel, the technologist, took was a film different than the study Dr. Bonica had ordered, correct?

**DR. CRISCI.** That is absolutely correct.

**Q.** Dr. Bonica ordered a chest x-ray and Miss Nickel took an abdominal x-ray, correct?

**A.** That is absolutely correct.

N.T. 05.10.16 (p.m.) p. 93.

AMH x-ray technologist Jillian Nickel and AMH radiology manager Joan Diaz both testified that AMH lacked any written policy regarding the duties of a radiology technician. Ms. Nickel testified as follows:

**MR. TRUNK:** Now, as of 2008, I'm talking December of 2008, at the time of Mr. Summerford's death, there were no written policies at Abington Memorial Hospital regarding the duties you performed as a radiology technician or technologist, correct?

**JILLIAN NICKEL:** No.

**Q.** I'm incorrect?

**A**. Huh?

**Q.** I'm incorrect or I'm correct that there were no written policies?

**A.** Correct.

**X X X**

**Q.** Okay. As a matter of fact, you got the study that you intended to get that day [December 3, 2008], right?

**A.** Yes.

**Q.** You got from the base of the lungs down even a little lower than the iliac crest, right?

**A.** Yes.

**Q.** And when you took that x-ray, you thought you were following what was a protocol at Abington Memorial Hospital, correct?

**A.** For an Entec placement, yes.

**Q.** For an Entec placement, and that's something that you say your boss, Joan Diaz, told you to do?

**A.** Yes.

N.T. 05.11.16 (p.m.) pp. 23-27.

Ms. Diaz testified as follows:

**MR. TRUNK:** Your responsibilities [as radiology manager at AMH from 1999-2008] relating to x-rays included overseeing staff, scheduling and operational means, correct?

**JOAN DIAZ:** Correct.

**Q.** And in 2008, as of 2008, the time of Mr. Summerford's care, there were no protocols or policies regarding the anatomy a radiology technologist should capture when viewing an x-ray to check the placement of a feeding tube; do you agree with that?

**A.** Written? Correct.

**Q.** Okay. There were no policies, written or otherwise?

**A.** There were no policies.

N.T. 05.11.16 (p.m.) p. 34.

And later:

**MR. TRUNK:** Back in 2008, was there any policy or protocol or guideline or anything that said that when checking the placement of a feeding tube, you need to get the upper chest, and you need to get the airway down to the abdomen? Was there anything like that?

**A. No.**
N.T. 05.11.16 (p.m.) p. 41.

Finally, Dr. Igidbashian testified that AMH's breach significantly increased the risk of harm to Mr. Summerford.

**Q.** And we talked about that there was no policy at Abington, policy or procedure or protocol, as to what study should be used to check the placement of a feeding tube. Was that a breach of the standard of care?

**A.** Yes.

**Q.** And did that increase the risk of harm to Mr. Summerford?

**A.** Yes.

**Q.** Back in 2008, should a hospital have known what could happen or what harm could result if the wrong study is taken to check the placement of a feeding tube?

- 49 -

**A.** Yes.

**Q.** And what should they have known about that? What did the standard of care require that a hospital know could happen, what harm could happen, if the wrong study is taken to check the placement of a feeding tube?

**A.** That the patient can be severely affected by the malpositioned tube.

**Q.** And affected, is that in a bad way?

**A**. Harm to the patient.

N.T. 05.10.16 (a.m.), pp. 137-138.

This testimony sufficiently sets forth a *prima facie* case of corporate negligence.[11] The evidence in the record clearly established there were no written policies or protocols in place in 2008 regarding the performance of a chest x-ray. Ms. Nickels did not obtain a chest x-ray as ordered by Dr. Bonica. The technicians were left on their own to determine what anatomy to image. There was inconsistency within the department regarding how a chest x-ray should be performed. Dr. Igidbashian stated that the December 3rd x-ray failed to include portions of Mr. Summerford's airway to enable Dr. Crisci to make a correct interpretation.

Dr. Igidbashian's expert testimony established that AMH's lack of written policies was below the standard of care and increased the risk of harm to plaintiffs decedent. Further, he testified that AMH should have known of the harm which could result from a wrong study to confirm placement of a feeding tube. Since the record contained sufficient evidence of a *prima facie* case of corporate negligence, the court correctly allowed that claim to go to the jury. The jury's verdict was supported by substantial evidence and the trial court properly denied AMH's request for JNOV on this ground. *Robinson v. Upole,* 750 A.2d 339 (Pa.Super.2000); *Rohm & Haas Co. v. Continental Cas. Co.,* 732 A.2d 1236, 1247 (Pa.Super.1999) quoting *Moure v. Raeuchle,* 529 Pa. 394,604 A.2d 1003, 1007 (1992).

\*\*\*

As earlier stated, Dr. lgidbashian testified as follows:

- 50 -

**Q.** We saw earlier that Dr. Bonica, first, ordered a chest x-ray. And you told us that Jillian Nickel, the technologist, performed an abdominal study. Was that a breach of the standard of care?

**A.** Yes.

**Q.** And did that increase the risk of harm to Mr. Summerford?

**A.** Yes.

N.T. 5.10.16 (a.m), p. 136.

**Q.** If in this case Jillian Nickel testified -- this is a hypothetical question now, Doctor. If in this case Jillian Nickel testified, the technologist testified, that she was taught that you check the placement of a feeding tube by taking a study that goes from the base of the lungs, or the bottom of the lungs, down to the iliac crest, is that the proper study to take to check the placement of a feeding tube?

**A.** No.

**Q.** Why not?

**A.** Because you don't see the airway.

**Q.** And-

A. You can't see the course of the tube.

**Q.** If that is what she was taught, would that be a breach of the standard of care?

**A.** Yes.

**Q.** And if that's how she was performing studies to check the placement of a feeding tube, is that a breach of the standard of care?

**A.** Yes.

N.T. 5.10.16 (a.m.), p.140.

There was sufficient evidence that the conduct of Jillian Nickel was below the standard of care and that AMH was vicariously liable for the conduct of its employee. Accordingly, AMH is not entitled to judgment *n. o.* v. on this ground.

_____
[11] Dr. Igidbashian also testified that AMH breached its duty to provide oversight of how Ms. Nickels performed studies to check the placement of a feeding tube which increased the risk of harm to Mr. Summerford. N.T., 5.10.16 (a.m.), p.p. 139-141. AMH does not challenge on appeal the sufficiency of evidence offered in this regard.

Trial Court Opinion, filed 12/29/16, at 33-39.

AMH next argues this Court should vacate the judgment and grant a JNOV or, in the alternative, remand for a new trial on the vicarious liability claim against AMH due to the trial court's permitting Dr. Igidbashian to opine as to Ms. Nickel's conduct, although he was no qualified to do so. In setting forth this claim, AMH states the following:

It was undisputed that AMH staff would (and did) only begin feeding when a radiologist confirmed the placement of a feeding tube. Therefore, liability in this case was hinged entirely on Dr. Crisci's misinterpretation of the x-ray, which [Appellee] succeeded on at trial; but [Appellee] should not have been permitted to convert that error into a claim of negligence against AMH for the taking of the December 3 x-ray itself.

*** 

And so, because the evidence was sufficient for the jury to find that [Appellee] proved that Dr. Crisci was negligent for misreading the x-ray taken then, *necessarily*, the verdict against AMH on the theory that a different x-ray study should have been done by Jillian Nickel, was against the clear weight of the evidence. . . .

Brief of AMH at 52, 54 (emphasis in original).

In the alternative, AMH asserts the verdict on the vicarious liability claim was against the clear weight of the evidence and unsupported by proficient expert testimony, for Dr. Igidbashian admitted he is not a radiology technologist who has taken x-ray films and has not positioned a patient for over thirty years. Brief of AMH at 55.

We previously set forth herein the liberal standard for the qualification of an expert witness. Dr. Igidbashian testified he had thirty years of experience in the radiology field and maintained an active medical practice in that field. He also worked as a clinical instructor in radiology and served as chairman of the St. Francis Hospital Radiology Department where he developed a policy and procedure concerning the radiologic confirmation of the placement of a feeding tube. N.T. Trial, 5/10/16 a.m. at 7-17. Although there was no objection to Dr. Igidbashian's testifying as an expert in the field of radiology and in the field of radiological checking of feeding tubes, *Id*. at 33, the trial court allowed Dr. Igidbashian to testify, over objection, as an expert regarding policies, procedures, and protocols relating to feeding tubes from a radiologic perspective. *Id*. at 33-34, 64-65.

In *Vicari v. Spiegel*, 605 Pa. 381, 989 A.2d 1277 (2010), our Supreme Court found an oncologist to be qualified to testify as an expert against both an otolaryngologist and radiation oncologist in a medical malpractice case, even though the oncologist was board certified by a different board and practiced in a different subspecialty than the defendant physicians. Therein,

the oncologist testified as to whether the standard of care for the defendant physicians included a requirement that they offer a patient suffering from tongue cancer the option of follow-up chemotherapy and treatment with a medical oncologist. The Court found the oncologist possessed sufficient training, experience and knowledge to testify as to the standard of care due to his active involvement in a related medical field and the fact he had maintained a clinical practice for 30 years, which included the administration of chemotherapy to cancer patients, including head and neck cancer patients. Herein, Dr. Igidbashian instructed and supervised radiology technologists concerning proper procedures that he, himself, helped to create in a hospital setting and in his role as Chairman of the Radiology Department at St. Francis Hospital. N.T., 5/10 16 a.m. at 58. In light of all the foregoing, we find the trial court properly permitted Dr. Igidbashian to testify regarding the applicable standard of care of radiology technologists generally and the actions of Ms. Nickel herein.

Finally, AMH alleges that a new trial on damages or a remitter is required herein. AMH stresses that when the eighty-eight-year-old Mr. Summerford was admitted to the hospital on November 30, 2008, his prognosis was bleak as he suffered from numerous ailments, was critically ill, and had a life expectancy of only one year. AMH adds that Mr. Summerford was sedated throughout the time the feeding tube was inserted and the entire evening of December 3rd into December 4th, 2008; therefore, he does not have a

substantial claim for pain and suffering of the type "usually seen in awards in the mid-seven figures." Brief of AMH at 57-58. AMH explains that Mr. Summerford had no employment prospects and no economic damages were sought herein; thus, the 3.5 million survival act award exceeds "appropriate comparison with economic damages" and is "grossly exorbitant" and "shocks the conscience." *Id*. at 59-60.

Upon noting that AMH's arguments on this issue essentially mirror those presented by Dr. Crisci and RGA in their challenges to the damage award and in light of our disposition of that claim *supra*, we find AMH is not entitled to relief on this final issue.

Judgment affirmed.

Judge Panella joins the Opinion.

Judge Olson concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/30/18