J-A20040-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| HANNA MARHUNOVA, AS ADMINISTRATRIX OF THE ESTATE OF SIARHEI MARHUNOU, DECEASED, AND IN HER OWN RIGHT | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | |
| FITLER CONSTRUCTION GROUP, LLC, OCF CONSTRUCTION LLC, 2330 SANSOM STREET, LLC, HSC CONSTRUCTION, INC., HAMMERS CONTRACTORS, INC., | : : : : : : : : | No. 2450 EDA 2024 |
| v. | : : : | |
| DPSY, LLC | : | |

Appeal from the Judgment Entered September 3, 2024
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s):  220501520

BEFORE:   MURRAY, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.:      **FILED FEBRUARY 25, 2026**

OCF Construction LLC ("OCF") appeals from the judgment entered in favor of Hanna Marhunova ("Plaintiff"), as administratrix of the estate of Siarhei Marhunou ("Decedent"), and in her own right, against OCF in the

_____

[*] Retired Senior Judge assigned to the Superior Court.

amount of $37,517,278.75.[1]  Said judgment follows a jury trial, the result of which led to a determination that OCF, in its capacity as general contractor, was 50% liable for Decedent's death, who, at the moment of his death, had been performing work as an employee for a subcontractor of a subcontractor in the construction of luxury townhomes. OCF presents four issues for this Court's review, chiefly contending that the trial court erred in denying its request for judgment notwithstanding the verdict ("JNOV") given its position that Plaintiff failed to demonstrate OCF's legal duty in tort to Decedent and breach thereof, resulting in Decedent's harm. After a thorough review of the record, we affirm.

As summarized by the trial court:

On December 15, 2021, [Decedent] was installing siding on a luxury townhome being built in Philadelphia when he fell to his death forty-five feet below. [Decedent] was not provided a fall arrest system by OCF [], who the jury determined bore responsibility under a contract to provide safety equipment and oversee safety on the jobsite, and[, contemporaneous with Decedent's fall,] the wood from a guardrail that was installed as a safety measure fell to the ground with him. He survived for only a second after impact.

On May 17, 2022, Plaintiff [] initiated this [n]egligence, Wrongful Death Act, and Survival Act action by [c]omplaint on her own

---

[1] OCF filed a praecipe to enter judgment on August 30, 2024, and the docket reflects that notice, pursuant to Pennsylvania Rule of Civil Procedure 236, was provided of that praecipe on September 3, 2024, the operative date for present appeal purposes. **See** Pa.R.A.P. 108(b) ("The date of entry of an order in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the date on which the clerk makes the notation in the docket that written notice of entry of the order has been given as required by Pa.R.Civ.P. 236(b).").

behalf, on behalf of her minor son, and as a personal representative of her late husband['s] estate. The lawsuit proceeded to [a] trial by jury before [the trial c]ourt from June 24, 2024[,] through June 27, 2024.

For factual background as to the [named d]efendants and their relationships, 2330 Sansom LLC [("2330 Sansom")] is the property owner, the owner of the townhomes once construction is complete, and developer of the property. 2330 Sansom is partially owned and fully managed by member Ori C. Feibush. At trial, [] Feibush testified that he was the only person who could hire a contractor on behalf of 2330 Sansom[,] and on November 4, 2020, 2330 Sansom contracted with OCF [] for OCF [] to serve as the general contractor on the project[,] building five luxury townhomes. OCF [] was solely owned by [] Feibush. [] Feibush testified on behalf of OCF [] at trial and testified that OCF [] was listed as a "placeholder" at the time that they applied for construction permits from the City [of Philadelphia]. [] Feibush also partially owned Fitler Construction Group, LLC, [("Fitler Construction")] which he testified that he verbally hired as the new general contractor on the project. He testified that he expected Fitler Construction to take over the obligations under the contract, including safety obligations. On April 27, 2021, OCF [] emailed the City of Philadelphia's Department of Licenses and Inspections that OCF [] was terminated by 2330 Sansom for cause.

Fitler Construction subcontracted with Hammers Contractors[, Inc., ("Hammers")] as a framing subcontractor, [which] also [had] responsibility for installing safety equipment as well as inspecting and maintaining the guardrail, and Hammers subcontracted with [D]ecedent's employer, DPSY[, LLC] ("DPSY"). Fitler Construction also subcontracted with HSC[, Construction, Inc., ("HSC")] as a siding subcontractor. Plaintiff's construction safety expert, David Shawn Bradfield, testified that HSC Construction was responsible for installing, maintaining, and inspecting the guardrails on site. [] Bradfield also testified that Fitler Construction's choice of incompetent subcontractors and failure to competently supervise them in the field caused or contributed to [D]ecedent's fall. [] Bradfield also testified that OCF [] was responsible for [Decedent's] fall protection while performing siding work and that[,] as the prime general contractor, OCF had the non-delegable duty for overall site safety and was required to oversee all work performed by any subcontractor. Several portions of the

- 3 -

written contract between 2330 Sansom and OCF [], the general contracting agreement [("Agreement")], [A]rticle II governing supervision and construction procedures, and [S]ection 3.1 regarding labor and materials were submitted to the jury.

Further, [] Bradfield testified that there was evidence that OCF [] continued to act as the general contractor on the project following its termination by [] Feibush. As examples, [] Bradfield testified that on July 2, 2021, OCF [] signed a letter for a change order on a project submitted to the City of Philadelphia. In November 2021, [] Peter Castellucio, foreman for Fitler Construction, submitted another change order on behalf of OCF []. Additionally, following OCF['s] termination, the Philadelphia Department of Licenses and Inspections continued to cite OCF [] for violations at the construction site.

At trial, the parties stipulated that "at the time of the accident, the horizonal and vertical members of the guardrail on the west side of the subject balcony were in place, that [Decedent] struck the guardrail during his fall, and that the pieces of the guardrail fell to the ground with him." There were no witnesses to the accident[,] and video footage captured only the last ten feet of his fall. Accordingly, there was no evidence to submit to the jury regarding any comparative negligence on [Decedent's] behalf.

On June 27, 2024, the jury found the [following] defendants negligent and their negligence to be a factual cause of harm to [Decedent] in the following proportions: Fitler Construction[: 20%;] OCF[: 50%;] 2330 Sansom Street[: 20%;] HSC[: 9%;] and Hammers[: 1%]. The jury awarded [Decedent's estate] 13.5 million dollars on the estate's Survival Act claim, awarded Hanna Marhunova [25] million dollars on her Wrongful Death Act claim and awarded [their son,] Eric[, 30] million dollars on his Wrongful Death Act claim.

On July 5, 2024, [] OCF [] filed post-trial motions requesting [the trial c]ourt to grant post[-]trial relief in the form of [JNOV], a new trial, a new trial on damages, or a substantial remittitur of the jury's verdict. Plaintiff filed a motion for delay damages on July 8, 2024. Following oral argument on August 13, 2024, [the trial c]ourt denied [OCF's] request for post-trial relief and granted Plaintiff's motion for delay damages by [o]rder dated August 14, 2024.

On September 12, 2024, [] OCF filed [a timely n]otice of [a]ppeal to [this] Court [and thereafter filed a timely concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b)].

Trial Court Opinion, 12/24/24, at 1-4 (record citations and emphasis omitted).

OCF presents four issues for our review:

1. Did the trial court err in denying its request for JNOV on Plaintiff's negligence claim–the only claim asserted against OCF–after Plaintiff failed to prove that OCF owed Decent a legal duty in tort that was breached and caused Decedent's harm?

2. Did the trial court err in denying its request to vacate the Wrongful Death Act awards, where Plaintiff failed to adduce sufficient evidence to support either awards or their magnitude, and where the trial court's rationale for denying OCF's request for JNOV as to these claims–that the law "presumes" evidence of damages to support a Wrongful Death Act claim–is directly at odds with controlling Pennsylvania precedent?

3. Did the trial court err or abuse its discretion in denying its request for a new trial on weight of the evidence grounds, where the record does not support the existence of a duty owed by OCF or a breach of any duty that caused harm, particularly where the trial court acknowledged that "no one knows" what happened to cause Decedent's injuries?

4. Did the trial court err or abuse its discretion in denying its requests for a new trial on damages as a substantial remittitur, where the jury's awards were against the overwhelming weight of the evidence, shocked the conscience, were excessive, and were unsupported by the record?

*See* Appellant's Brief at 5-6.

In its first claim, OCF contends that the court should have granted JNOV

because Plaintiff failed to demonstrate, as a necessary component in proving

a negligence action, that it owed *any* duty to Decedent.[2] However, even if OCF owed such a duty, OCF separately maintains that Plaintiff failed to show any breach of its duty or causality in its actions or inactions leading to Decedent's harm.

There are two bases upon which a movant is entitled to JNOV: "one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." *Rohm and Haas Co. v. Continental Cas. Co.*, 781 A.2d 1172, 1176 (Pa. 2001) (citation omitted). Although OCF, in its argument section, fails to identify under which circumstance it believes JNOV should have been granted, we presume it to be the former because, *inter alia*, OCF contends that Plaintiff did not prove the requisite elements of negligence and therefore judgment should have been

---

[2] In refuting the existence of a duty, OCF avers that Plaintiff cannot rely on the Agreement between OCF and 2330 Sansom to assert a tort claim, as: (1) Decedent (and, by extension, Plaintiff) was not a third-party beneficiary under the Agreement; (2) the Agreement does not impose a safety-related duty on OCF to oversee Decedent's safety; and (3) the Agreement was terminated between OCF and 2330 Sansom before Decedent's death. *See* Appellant's Brief at 21-28. Outside of the Agreement, OCF additionally argues that: (1) the Restatement (Second) of Torts, Occupational Safety and Health Administration ("OSHA") regulations, and the American National Standards Institute ("ANSI") do not establish the existence of a duty; (2) Plaintiff's expert cannot, in effect, "create" a tort-based duty through testimony; (3) OCF was not the general contractor when Decedent died, but even if it was, it still owed no duty in tort to Decedent; and (4) Plaintiff's claim was barred by the "gist of the action" doctrine, given that Plaintiff's cause of action is derived from the Agreement yet sounds in tort. *See id.* at 29-43.

entered in its favor as a matter of law. Accordingly, under that basis, JNOV should be entered after "a court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor[.]" ***Sheard v. J.J. DeLuca Co., Inc.***, 92 A.3d 68, 74 (Pa. Super. 2014) (citation omitted).

Under our purview on appeal, however, "[w]hen reviewing a trial court's denial of a motion for [JNOV], we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict[.]" ***Garced v. United Cerebral Palsy of Philadelphia and Vicinity***, 307 A.3d 103, 113 (Pa. Super. 2023) (citation omitted). This Court reviews the denial of a request for JNOV for an error of law that controlled the outcome of the case or an abuse of discretion. ***See Hutchinson v. Penske Truck Leasing Co.***, 876 A.2d 978, 984 (Pa. Super. 2005). An abuse of discretion occurs "if the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias[,] or ill-will." ***Id.*** (citation omitted). When reviewing the denial of a request for JNOV, we examine the evidence in the light most favorable to the verdict winner. ***See Thomas Jefferson Univ. v. Wapner***, 903 A.2d 565, 569 (Pa. Super. 2006) (citation omitted). As such, "the grant of [JNOV] should only be entered in a clear case[.]" ***Id.*** (citation omitted). Finally, we note that "[c]oncerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not

substitute our judgment for that of the finder of fact." **Sheard**, 92 A.3d at 74 (citation omitted).

Applying the appropriate standard of review, requiring, *inter alia*, this Court to review the evidence in the light most favorable to Plaintiff, as the verdict winner, we must first discern whether, in this negligence action,[3] it was an abuse of discretion or error of law for the court to conclude that OCF owed a duty to Decedent.

Instantly, the trial court found that "the evidence presented at trial [demonstrated] that [OCF] was the operating general contractor on the jobsite and accordingly owed [Decedent] a duty in tort to keep the premises safe and breached that duty to [Decedent] by failing to provide proper safety equipment." Trial Court Opinion, 12/24/24, at 6. This finding, the court determined, satisfied the first of four elements required in Plaintiff's negligence suit:

> Evidence presented by the Plaintiff showed that [OCF] was the general contractor on the project through a contract with 2330 Sansom LLC that was executed on November 4, 2020. This contract provided that [OCF] was responsible for managing all aspects of the job[,] and Plaintiff's construction safety expert testified that that included providing safety equipment.

_____

[3] "[T]o establish a claim of negligence[,] the plaintiff has the burden of proving four elements: 1) a duty or obligation recognized by law; 2) a breach of that duty; 3) a causal connection between the conduct and the resulting injury; and 4) actual damages." **Kelly v. St. Mary Hosp.**, 778 A.2d 1224, 1225 (Pa. Super. 2001) (citation omitted).

Although [OCF] testified through owner [Feibush] that [his] other company, Fitler Construction LLC[,] was the general contractor on the project, sufficient evidence was presented to the jury for it to make the determination that OCF was acting as a general contractor following [Feibush's] termination of [OCF]. [Feibush] never submitted a contract [between those entities,] and any argument of a verbal contract is moot as evidence presented showed that [OCF]–not Fitler Construction–continued to operate as general contractor following a letter of termination sent to the City of Philadelphia. [OCF] continued to issue change orders and continued to be cited by the City of Philadelphia for issues on the jobsite. Accordingly, as the general contractor on the project, [OCF] had a contractual obligation and legally recognized duty to [Decedent] to oversee and provide for his safety while working on this construction site.

*Id.* at 7-8 (record citations omitted).

As to the remaining elements of negligence–breach of duty, causality, and damages–the court found as follows:

[Bradfield] testified to a breach of the duty owed to [Decedent and] that [OCF] was responsible to provide a fall arrest system for anyone working on the balcony of the property. The system would have had tie off points on the roof which would have prevented someone falling to their death while working at this height. OCF did not provide a fall arrest system in accordance with safety mandates to [Decedent] the day that he was working[,] and when he fell, he lost his life. The Philadelphia Medical Examiner's Office concluded that the cause of death was multiple blunt impact injuries with fractures and visceral injuries (injuries to his organs sustained after impact). The third element of proximate cause of the conduct and resulting injuries was met because if [Decedent] had proper personal protective equipment available to him, he would not have hit the ground when he fell and [c]ould have been injured but would not have died.

Finally, the damages resulting from [OCF's] conduct are the loss of [Decedent's] life. When [Decedent] hit the ground, he had bilateral rib fractures in the front and back of his chest and suffered broken bones in his skull and face. [Decedent's wife] lost her husband[,] and their three-month-old [son] lost his father and

all future opportunity for his care, companionship, guidance, comfort, and society.

*Id.* at 8-9 (record citations omitted).

The court also indicated that

Plaintiff provided ample evidence that [OCF] breached a contract with the property owner 2330 Sansom when it had a duty by way of a written contract to oversee the safety on the construction site[] and to oversee the subcontractors who also had safety responsibilities[] and did not do so.

Section II of the contract between 2330 Sansom and [OCF] was read to the jury and submitted into evidence:

> Contractor shall supervise and direct the work using commercially reasonable skill and attention. Contractor shall oversee all work performed by any subcontractor, and have control over the construction means, methods, techniques, sequences, and procedures and for coordinating all portions of the work under the contract documents.
>
> 3.1. Labor and Materials. Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment, and machinery.

[Bradfield] testified that if a piece of equipment needed to be provided on this construction site to protect workers, the general contractor was responsible. [OCF] did not provide or install a fall arrest system that would have saved [Decedent's] life if he were wearing it when he fell. Accordingly, sufficient evidence was presented to the jury for [it] to make a determination that [OCF] breached a contract as general contractor with the property owner.

Moreover, Plaintiff did not "fail to establish any claim against [OCF] sounding in breach of contract" because Plaintiff did not bring a breach of contract claim against [OCF]. Plaintiff filed a negligence action, a [W]rongful [D]eath [A]ct action, and a [S]urvival [A]ct action against [OCF].

*Id.* at 10-11.

- 10 -

The gravamen of OCF's claim is that, in its view, a breach of the Agreement between OCF and 2330 Sansom, an express finding made by the court, "cannot provide the basis for a tort duty [undertaken by OCF to the benefit of Decedent]." Appellant's Brief at 23. OCF contends, instead, that Plaintiff, having asserted a claim in tort and not contract, failed to demonstrate that OCF violated a "broader social duty" owed to all individuals not encompassed by the Agreement, necessary for demonstration of an independent tort duty. *See id.* at 22, citing, *inter alia*, **Ash v. Cont'l Ins. Co.**, 932 A.2d 877, 884 (Pa. 2007). As a further point of emphasis, OCF argues that "the Agreement did not contain any promise to Decedent to provide a safe working environment." *Id.* at 23; *id.* at 24 (stating, further, that neither Decedent nor his employer were parties to the Agreement or third-party beneficiaries thereunder).

To make its point about the Agreement's inapplicability to Decedent, OCF relies on the Agreement's language insofar as it states that

Contractor shall supervise and direct the Work[4], using

_____

4 The Agreement defines "Work" as:

the totality of construction and services required by the Contract Documents, whether completed or partially completed, including all other labor, materials, equipment and services provided or to be provided by Contractor. The Work shall include such additional items of labor, materials, equipment or services which are reasonably inferable from that shown or specified in the Contract Documents and may constitute the whole or a part of the Project.

Agreement, Article I, § (m).

- 11 -

commercially reasonable skill and attention. Contractor shall oversee all Work performed by any Subcontractor[5], and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract Documents.

Appellant's Brief at 25 (quoting Agreement, Article II). OCF then argues that it was not in contract with Decedent's employer[6] and its promise, contained in the Agreement, to "supervise and direct the work" was made to 2330 Sansom, as the owner of the property, not Decedent or his employer. ***Id.*** at 25. OCF also highlights Article III of the Agreement, which, *inter alia*, states that the "Contractor shall provide . . . materials, equipment, tools, construction equipment and machinery . . . necessary for proper execution and completion of the Work[.]" ***Id.*** at 26 (quoting Agreement, Article III, § 3.1). OCF contends this provision is a "general promise, common in construction contracts, made to [2330 Sansom], not Decedent, his employer, or Plaintiff." ***Id.*** OCF finally

_____

[5] The Agreement defines "Subcontractor" as:

a person or entity having a direct contract with Contractor to perform a portion of the Work at the site. The term "Subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Subcontractor or an authorized representative of the Subcontractor. The term ·'Subcontractor" does not include a separate contractor or subcontractors of a separate contractor.

Agreement, Article I, § (k).

[6] As previously stated in the court's factual summary, Fitler Construction, the "verbally contracted new contractor," subcontracted with Hammers who then subcontracted with DPSY, Decedent's employer.

avers that, even if the Agreement between OCF and 2330 Sansom did create a duty, it was terminated prior to Decedent's death. *See id.* at 27-28 (citing, *inter alia*, Feibush's testimony establishing that the Agreement was terminated, and Fitler Construction was, instead, hired as the new general contractor).

Conversely, Plaintiff relies on Bradfield's testimony, which provided unobjected-to explanation to the jury about the Agreement's provisions, both within the meaning of the construction industry and as applied here. In particular, Bradfield stated that, under the Agreement, OCF agreed "to gather the work, perform the work, pay the subcontractors, and manage all aspects of the job." N.T. Jury Trial, 6/24/24, at 33. Moreover, "if a piece of equipment needed to be provided on [the] construction site to protect workers," *id.* at 34, OCF was responsible, as the general contractor. Later, Bradfield reiterated that, based on the evidence he had reviewed, "OCF [was] the documented general contractor." *Id.* at 70. Notwithstanding the alleged termination of the Agreement, there was evidence that "OCF continued to be the general contractor throughout the project." *Id.* OCF "was responsible for providing [Decedent] with appropriate fall protection to put . . . siding up[,]" and "OCF . . . failed to do that.[.]" *Id.* at 70-71; *see also id.* at 67 (Bradfield testifying that OCF was responsible for providing fall protection, including tie-offs).

Bradfield also indicated that, under Occupational Safety and Health Administration ("OSHA") regulations, OCF, as general contractor, had a

nondelegable duty to ensure safety on the jobsite. **See** N.T. Jury Trial, 6/25/24, at 46-49 ("Once you accept the responsibility of a general contractor[, under OSHA's regulations], you can't delegate it away and have a lower-tier subcontractor take it over for you. You own it as long as you have that."). As to whether the Agreement had been, in fact, terminated, Plaintiff points to Feibush's own testimony in which he admitted that did not go through the proper procedure to terminate the Agreement. **See** N.T. Jury Trial, 6/26/24, at 70, 74 (Feibush, who maintained some level of ownership in OCF, Fitler Construction, and 2330 Sansom, testifying that OCF "was terminated, admittedly, not by written statements[]").

Having considered both sides, we find that the most instructive point of law, here, is Section 324A of the Restatement (Second) of Torts, cited approvingly by our Supreme Court in *Farabaugh v. Pennsylvania Turnpike Com'n*, 911 A.2d 1264, 1277-78 (Pa. 2006), which states that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> > (a) his failure to exercise reasonable care increases the risk of such harm, or
> >
> > (b) he has undertaken to perform a duty owed by the other to the third person, or
> >
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A. Pursuant to this authority, "a plaintiff

may bring a cause of action sounding in tort based upon a defendant's negligent performance of contractual obligations owed to another party." ***Farabaugh***, 911 A.2d at 1277; ***see also id.*** at 1267 ("[A] construction manager's duty is defined by the intent of the contracting parties as reflected by their contractual designation of responsibilities.").

For a duty to be established, the first question, therefore, is whether there has been an undertaking to render services. Then, it must be considered if it "was foreseeable that a failure to" perform a contractual undertaking "could result in injuries to the workers on the site." ***Id.*** at 1283-84.

OCF contends that it merely agreed to oversee the work by subcontractors that it contracted with, "but OCF never subcontracted with anyone, let alone Decedent or his employer." Appellant's Brief at 30. Although OCF is correct that it never subcontracted with DPSY and, moreover, it is correct that, under the Agreement, a "Subcontractor" is a person or entity having a direct contract with OCF, OCF's "undertaking," as the party responsible for the "Work," is much broader than that within the meaning of the Agreement. First, the Agreement indicates that OCF, without qualification, "shall supervise and direct the Work[.]" Agreement, Article II. Assuming, as one must, that DPSY's work fell under "the totality of construction and services required by the Contract Documents," Agreement, Article I, § (m), notwithstanding its lack of contractual privity with OCF, under a plain reading of the Agreement, OCF would still be responsible for its "construction and

services." Moreover, OCF agreed that it would, in general, "have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work[.]" Agreement, Article II.

When coupled with Bradfield's testimony, who confirmed that, pursuant to the Agreement, OCF was responsible for providing job-site protection, it is clear that it was not an abuse of discretion for the court to find that: (1) OCF, in its capacity as general contractor tasked with facilitating the construction project as a whole, agreed to render safety services necessary to complete the "Work"; and (2) it was foreseeable that a failure to perform this safety role could result in an injury to Decedent as well as others on the job site. *See Farabaugh*, 911 A.2d 1283-84; *see also* Restatement (Second) of Torts § 324A, Comment d. ("Even where the negligence of the actor does not create any new risk or increase an existing one, he is still subject to liability if, by his undertaking with the other, he has undertaken a duty which the other owes to the third person."). Accordingly, although not in direct contract with either Decedent or DPSY, OCF, from its undertakings it assumed in the Agreement, had a duty to ensure safety.

To the extent that OCF additionally argues that the Agreement was terminated and therefore had no legal effect on OCF following its termination, Feibush's own testimony in which he indicated that there was no formal written termination notwithstanding the Agreement's requirement to do so, in addition to OCF's continuing status as general contractor, evidenced by legal

documentation referring to it as such, belies OCF's claim of termination.[7] At a minimum, given Feibush's admissions and involvement in 2330 Sansom, OCF, *and* Fitler Construction, often times to the point of ambiguity in distinguishing between the entities, it was not an abuse of discretion for the court to find that OCF continued to act as general contractor and that the thrust of the Agreement, therefore, continued with full force on the date of Decedent's death.[8]

OCF next argues that, even assuming OCF owed Decedent a duty, Plaintiff, as to the breach and causation elements of her negligence claim, "failed to adduce sufficient *evidence* that OCF breached a duty that caused Decedent's harm." Appellant's Brief at 40 (emphasis in original). Notwithstanding OCF's framing that, in essence, states that no one knows how Decedent fell, given the lack of witnesses and relevant video recordings, **see id.** at 41, its argument misses the point.

_____

[7] We note that the jury, as the trier of fact, "exclusively weighs the evidence, assesses the credibility of witnesses, and may choose to believe all, part, or none of the evidence." **Commonwealth v. Sanchez**, 36 A.3d 24, 26-27 (Pa. 2011). As such, it was within the jury's purview to ascertain, based on, *inter alia*, Feibush's own testimony, whether OCF was terminated as general contractor, thereby extinguishing any relevant applicability of the Agreement, at the time of Decedent's death.

[8] As we determined that Plaintiff established that OCF had a duty in tort to provide a safe job site, we do not consider OCF's additional arguments as they pertain to OSHA regulations, the American National Standards Institute guidelines, and alleged the creation of a duty via Plaintiff's own expert.

OCF admits that Plaintiff's expert testified that "OCF failed to provide Decedent a fall arrest system[, and] the Philadelphia Medical Examiner[']s Office . . . concluded that Decedent died upon his fall from multiple impact injuries." *Id.* at 42. As the trial court found: "if [Decedent] had proper personal protective equipment available to him, he would not have hit the ground when he fell and would have been injured but would not have died." Trial Court Opinion, 12/24/24, at 8. Although it is true that it is not specifically known if Decedent slipped on something, took a misstep, or otherwise, it is nevertheless true that OCF did not furnish him with a fall arrest system while he performed "Work" as defined by the Agreement, that would have, at least in the court's summation based on the evidence presented, saved his life. Moreover, OCF identifies no authority requiring direct evidence of the precise manner in which a negligence victim was injured to prove breach and causation. Finally, OCF has not challenged the notion that Decedent was performing "Work" within the scope of the Agreement and fell to his death *due to the lack of safety system*, allowing for attribution of that fall to be placed on OCF, which satisfies the elements of both breach and causation. Nevertheless, despite OCF's opposite contention, there *is* evidence of how his death occurred: Decedent fell without a harness–which, based on the jury's

finding, should have been provided by OCF.[9] Accordingly, the court committed neither an error of law nor abuse of discretion in denying OCF's request for JNOV when it determined that Plaintiff appropriately established the elements of negligence, namely demonstrating OCF's duty to Decedent.

In OCF's second claim, it avers that Plaintiff "failed to adduce *any evidence* of either economic or noneconomic damages sufficient to support the $25 million wrongful death award to herself, or the $30 million wrongful death award to her son." Appellant's Brief at 43 (emphasis in original); 44 (quoting **McMichael v. McMichael**, 241 A.3d 582, 588 (Pa. 2020), for the proposition that damages cannot be presumed and must be proven by facts). In particular, OCF states that "Plaintiff did not request medical, funeral, or other expenses, let alone prove them or their value at trial." **Id.** at 44. OCF contends that Plaintiff also failed to demonstrate economic damages in the form of the loss of Decedent's services, placing no estimated value on his contributions. **See id.** Moreover, OCF maintains that Plaintiff failed to present any evidence of her noneconomic damages, such as "the type of day-to-day life, activities, and companionship" had with Decedent prior to his death, that were necessary to establish the same. **Id.** at 45. Furthermore, as to Plaintiff and Decedent's son, OCF argues that there was no evidence presented of

_____

[9] Had OCF provided Decedent with a harness that Decedent thereafter failed to wear, the analysis would obviously be completely different.

either economic or noneconomic damages "[o]ther than changing diapers."

***Id.*** at 46.

> Broadly speaking, a verdict may not be disturbed simply
>
> because the evidence is conflicting or because the court would have reached a different conclusion . . .; rather, the award of a new trial based upon inadequacy of a verdict is proper only where the jury's finding appears to have resulted from "passion, prejudice, partiality, or corruption, or where it clearly appears from uncontradicted evidence that the amount of the verdict bears no reasonable relation to the loss suffered by the plaintiff."

***K.H. v. J.R.***, 826 A.2d 863, 875 (Pa. 2003) (quoting ***Kiser v. Schulte***, 648 A.2d 1, 4 (Pa. 1994)).

Pennsylvania's Wrongful Death Act, located at 42 Pa.C.S. § 8301, allows for certain enumerated relatives of a person killed by another's negligence, such as a spouse or child, to sue for damages they have sustained because of the decedent's death. ***See Tulewicz v. Se. Pa. Transp. Auth.***, 606 A.2d 427, 431 (Pa. 1992). "The damages recoverable in a wrongful death action include the present value of the services the deceased would have rendered to the family, had he or she lived, as well as funeral and medical expenses." ***Kiser***, 648 A.2d at 4. We have held that the Wrongful Death Act "permits a claimant to recover both economic and noneconomic damages, including damages for loss of society and comfort. Recovery under the act may also extend to the profound emotional and psychological loss suffered as a result of the death of a family member." ***Kimble v. Laser Spine Inst., LLC***, 264 A.3d 782, 792 (Pa. Super. 2021) (*en banc*) (citing ***Rettger v. UPMC Shadyside***, 991 A.2d

915, 932-33 (Pa. Super. 2010)).

Here, the trial court began by citing **Spangler v. Helm's New York-Pittsburgh Motor Exp.**, which expounds upon the categories relied on in determining noneconomic losses: "[a]ll these things–such as companionship, comfort, society, guidance, solace, and protection which go into the vase of family happiness–are the things for which a wrongdoer must pay when he shatters the vase." 153 A.2d 490, 485 (Pa. 1959). Then, it recounted testimony that the jury heard:

> [Plaintiff and Decedent] met at work, were married, and sought political asylum to come to the United States with only each other. [Plaintiff] testified that [Decedent] wanted to have children, was very happy to have their son, and helped her with him from the time that their son was born. [Decedent] helped [Plaintiff] when she was in the hospital following childbirth and learned how to change their son's diaper before she did.
>
> . . .
>
> [Ultimately, following extensive jury instructions on this issue,] the jury awarded [Plaintiff] twenty-five million dollars for the loss of her husband's companionship, comfort, society, guidance, solace, protection, profound emotional loss and her profound psychological loss. [Plaintiff] lost her life partner and child's father just days before the couple's third wedding anniversary. She testified that they could not celebrate their anniversary because "he died that day." When he died, the responsibility of taking care of a three-month-old [toddler] shifted completely to her alone without any family support either physically or emotionally.
>
> Additionally, the jury awarded [the son] thirty million dollars for the loss of his father's companionship, comfort, society, guidance, solace, and protection, as well as his profound emotional loss and psychological loss.

Trial Court Opinion, 12/24/24, at 12-13 (record citations omitted). The court

continued later:

> [Plaintiff] evidenced her profound grief and emotional loss before the jury–who serves as factfinder–when she could barely get out the words that when her son asks about his father, she tells him that his father went away to live on a cloud but loves him very much, through choking back tears. She testified that she came to the United States with her husband and that they wanted to live in peace, happily, together. The jury completed what [it was] tasked to do and quantified [Plaintiff's] noneconomic loss when it listened to her testimony, observed her grief as she tried to speak while choking through her tears, and awarded her [twenty-five million and her son] thirty million dollars for losing . . . her husband on the day that they would have celebrated their love and their life together.

*Id.* at 17-18.

We agree with OCF that the record contains no quantifiable evidence of economic damages. Similar to **McMichael**, Plaintiff "did not present any evidence of medical, funeral, or estate administration expenses. Thus, [her] potential recovery for economic damages was limited to the loss of Decedent's services." 241 A.3d at 590. However, to the extent Plaintiff testified about Decedent's services around the house or otherwise, she did not testify "to the estimated value of these contributions, or the cost of hiring someone to perform these tasks." *Id.* As, under **McMichael**, a jury award of economic damages must bear a rational relationship to proven economic damages, **see** *id.* at 591 (establishing that otherwise, the jury would have been forced to engage in "speculation"), we must therefore purely look to whether the court committed an error of law or abused its discretion in determining that the noneconomic damages awarded accorded with the verdict. **Cf.** Appellee's Brief

at 48 ("Plaintiff sought only non[]economic damages.").

Noneconomic damages do not carry with them a mathematical formula. *See* *McMichael*, 241 A.3d at 594. Nevertheless, "[t]he fact that there is no mathematical formula whereby compassionately bestowed benefits can be converted into a precise number of bank notes does not mean that the tortfeasor will be excused from making suitable reimbursement for their loss." *Spangler*, 153 A.2d at 492.

In *McMichael*, our Supreme Court found that, *inter alia*, a couple spending leisure time together, working on projects around the house, future intentions of a plan to build a cabin together, fixing breakfast for each other, and spontaneous date nights provided the basis for noneconomic damages, to be determined by the jury. *See* *McMichael*, 241 A.3d at 594.

At trial, Plaintiff indicated that she loved to travel with Decedent. *See* N.T. Jury Trial, 6/26/24, at 89. She also stated that the two of them knew they wanted "to live in peace, to have kids[,] and be happy." *Id.* at 90. When their child was born, Decedent would help Plaintiff "a lot from the very beginning, even when [she] was at the hospital." *Id.* at 92. Decedent "was the first one to learn how to change diapers and he was helping [Plaintiff] when [she] was still in bed after the delivery." *Id.* When Decedent came home from work, he would tell Plaintiff that when "he picked up his son he immediately would start feeling better." *Id.*

As to Decedent's son, specifically, the trial court relied on *Gaydos v.*

***Domabyl***, for the proposition that "[t]he law presumes the family relation and pecuniary loss to one under age." 152 A. 549, 554 (Pa. 1930). Specifically, "[p]ecuniary loss has been defined to be a destruction of a reasonable expectation of pecuniary advantage from the deceased. It is not a matter of guess or conjecture, but must be grounded on reasonably continuous past acts or conduct of the deceased." ***Id.*** at 552. Although we observe that pecuniary loss falls under the auspice of economic loss, the door remained open for the jury's ascertainment of Decedent's son's noneconomic losses.

Possibly due to Plaintiff's language barrier,[10] we agree with OCF to the extent that the record is relatively sparse as to the intricacies of the relationship that Plaintiff and Decedent had with one another in daily life. Plaintiff's entire testimony is limited to ten pages, several of which involve a back and forth on Plaintiff's background information, and little time was spent discussing anything germane to Decedent's son. Nevertheless, there is enough evidence of both Plaintiff and the three-year-old son's noneconomic damages, e.g., companionship, comfort, and society, as highlighted above and further refined through the court's opinion to sustain the jury's verdict. Based on the testimony Plaintiff provided, Plaintiff and Decedent were essentially best friends, having been married for three years on the date of

_____

[10] Plaintiff's native languages are Russian and Belarusian. ***See*** N.T. Jury Trial, 6/26/24, at 83. At trial, Plaintiff had an interpreter; the court indicated that it wanted Plaintiff "to wait for the interpreter before [she] answered." ***Id.*** at 84.

Decedent's death, and were strong partners in raising their son. As to Decedent's son, other than saying that there was nothing provided to establish his losses under the Wrongful Death Act, OCF has not shown what more could have been offered to sufficiently supplement the record to its satisfaction.[11] Accordingly, as to both the Plaintiff and Decedent's son, OCF has failed to demonstrate that the "verdict bears no reasonable relation to the loss suffered[.]" **K.H.**, **supra**.

In its third issue, OCF suggests that a new trial should be granted because its liability was against the "overwhelming weight of the evidence." Appellant's Brief at 49.

The role of the trial court in ruling on a challenge to the weight of the evidence is, as explained by our Supreme Court:

> addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the [factfinder's] verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

**In re M.B.**, 228 A.3d 555, 566 (Pa. Super. 2020).

---

[11] The record does not reflect the Decedent's son's then-capacity to provide testimony, but we presume, because he was a three-year-old, his ability to express himself verbally was limited, if not nonexistent.

Further, our standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the [trial] court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Id.* We also note that, in assessing a weight challenge, the factfinder is free to accept or reject the credibility of both expert and lay witnesses, and to believe all, part, or none of the evidence. *See Casselli v. Powlen*, 937 A.2d 1137, 1139 (Pa. Super. 2007).

Essentially, OCF's claim in this third issue is a reiteration of points it has already made: (1) Plaintiff failed to prove that OCF owed Decedent a duty that was breached and caused him harm; and (2) it was Fitler Construction, not OCF, who was the contractor on the project when Decedent died. *See* Appellant's Brief at 50. OCF also relies on Bradfield's testimony in which he blamed other entities for failing to provide Decedent with safety equipment. *See id*. Finally, OCF highlights Feibush's testimony in which he testified that "OCF did not do any construction; oversee any work; have any project managers; hire any contractors; pay any subcontractors; control any

subcontractor; or receive any compensation for the construction." *Id.* at 51.

To the extent these issues have not already been resolved or are irrelevant to OCF's own liability, although it has cited our standard of review, OCF has not provided any additional authority to evidence any possibility of success in its weight claim. As such, and for the reasons that have already been specified in this memorandum, we cannot say that it was an abuse of discretion for the trial court to conclude that the verdict did not "shock the conscience" as it pertains to OCF's liability in this matter, and OCF is therefore due no relief. *See Avery v. Cercone*, 225 A.3d 873, 877 (Pa. Super. 2019) ("[A] verdict that is against the weight of the evidence is a verdict that shocks the conscience of the trial court in light of the evidence presented.")

At OCF's final claim, it asserts that the jury's damages awards are against the overwhelming weight of the evidence and grossly excessive. OCF contends that: (1) the jury's award of $13.5 million under the Survival Act, located at 42 Pa.C.S. § 8302, "for, at most, mere seconds of pain and suffering, is arbitrary and capricious and not reasonable compensation," Appellant's Brief at 52; and, as argued before, (2) the jury's award of $25 million to Plaintiff and $30 million to Decedent's son lacked record support, *see* Appellant's Brief at 53. Accordingly, OCF argues that all three awards "shock the conscience." *Id.*

Relatedly, OCF avers that the award should be "substantially remitted" because "courts have a responsibility to keep awards within the limits of fair

and reasonable compensation." **Id.** at 54. OCF suggests that the aggregate

$68.5 million award is "completely unsupportable" because the "jury's verdict

was not reasonably intended to compensate Plaintiff but rather bypass the

lack of punitive damages and punish OCF anyway." **Id.** at 55. OCF then

indicates that "the award likely was based on improper factors" such as the

value of the townhomes being constructed and sympathy for Plaintiff. **Id.** at

55-56.

> As this Court has stated:

> The grant or refusal of a new trial due to the excessiveness of the
> verdict is within the discretion of the trial court. This Court will not
> find a verdict excessive unless it is so grossly excessive as to
> shock our sense of justice. . . . Similarly, our standard of review
> from the denial of a remittitur is circumspect and judicial reduction
> of a jury award is appropriate only when the award is plainly
> excessive and exorbitant. The question is whether the award of
> damages falls within the uncertain limits of fair and reasonable
> compensation or whether the verdict so shocks the sense of
> justice as to suggest that the jury was influenced by partiality,
> prejudice, mistake, or corruption. Furthermore, the decision to
> grant or deny remittitur is within the sole discretion of the trial
> court, and proper appellate review dictates this Court reverse such
> an [o]rder only if the trial court abused its discretion or committed
> an error of law in evaluating a party's request for remittitur.

**Tong-Summerford v. Abington Memorial Hospital**, 190 A.3d 631, 650-

51 (Pa. Super. 2018) (citation omitted).

In its opinion, premised on its denial of remittitur, the court determined

that

> there was absolutely zero evidence presented to suggest that the
> jury was influenced by partiality, prejudice, mistake[,] or
> corruption as the jury's award shows a careful and deliberate
> determination of liability apportioned amongst [the defendants].

- 28 -

The jury found [OCF] liable for 50% of Plaintiff's damages. Plaintiff's counsel's explanation that [Plaintiff's] award, when proportioned amongst defendants, amounts to roughly $500,000 a year for [Plaintiff], if she lives for another 60 years, [] is reasonable. Her son was awarded less by the jury, but the award is about $357,000 per year if he lives for 70 years, which is also reasonable.

As the Court in ***Tong-Summerford***[, which involved wrongful death and survival damages stemming from the death of an eighty-eight-year-old man with comorbidities] found an award of 1.5 million dollars proper for the wrongful death of [that p]laintiff's decedent who arguably had no life expectancy left, [it could likewise be found that] $500,000 a year and $350,000 a year is a proper award to a wife and a *minor* child.

Finally, while a survival damage of $13.5 million for one second of survival[12] may be unique, that [figure, in a vacuum,] is not a recognized or acceptable basis for this [c]ourt to reverse a

_____

[12] The court recounted the nature of Decedent's death as follows:

[Decedent] fell approximately forty-five feet until he hit the ground. The Philadelphia [Medical] Examiner's [O]ffice concluded that his cause of death was multiple blunt impact injuries with fractures and visceral injuries (injuries to his organs) sustained after impact. The impact caused him to suffer broken bones in his skull and face and injury his internal organs to the point that he died less than two seconds after impact. [Doctor] Wayne Ross, qualified by [the c]ourt to testify for the Plaintiff as a forensic pathologist and neuropathologist, testified that [Decedent] was conscious when he hit the ground and that it takes the human brain only 500 milliseconds (one half of a second) from the point of injury to consciously experience pain and suffering. [Decedent] endured injuries to his lungs when the fractures he suffered on impact with the ground became displaced and penetrated his lungs causing large, wide tears, bruises, and lacerations. He also suffered bruising to his liver, tears to his liver, tears to his spleen, and kidney hemorrhages.

Trial Court Opinion, 12/24/24, at 15-16 (record citations omitted).

carefully calculated jury award. The size of the award is not a basis for remittitur.

Trial Court Opinion, 12/24/24, at 22-23 (emphasis in original).

We agree with the thrust of the court's opinion on this point and find that, as to OCF's weight-based claims, that it was not an abuse of discretion for it to find that such awards, under the Survival Act or the Wrongful Death Act, did not shock the conscience. Relatedly, as to OCF's remittitur contention, it has failed to show that the court committed an error of law or abuse of discretion in denying the same. **See Tong-Summerford**, **supra**.

More particularly, however, in support of its contention that the $13.5 million in damages under the Survival Act was egregious, OCF cites: (1) a decision from our sister court, the Commonwealth Court; (2) a decision of this Court for the proposition that pain and suffering damages must not be arbitrary or speculative; and (3) a scaled and hypothetical representation of how much Plaintiff was awarded, should Decedent have lived ten seconds, thirty seconds, or one minute longer than the testimony that was provided indicated that he did. **See** Appellant's Brief at 52. OCF then summarily concludes that, based on the amount alone, that the awarded number was too large. As to the Wrongful Death Act awards, OCF reiterates what it believes to be the lack of record support for noneconomic damages as to both Plaintiff and Decedent's son.

Finally, as to remittitur, although it argues that the aggregate $68.5 million is completely unsupportable, OCF does not specifically explain *why* the

court, in its denial of OCF's request for remittitur, abused its discretion or committed an error of law. Even if, accepting OCF's contention as true, Plaintiff delved into impermissible subject matter through rhetorical references to the prices of the townhomes that Decedent was in the process of working on prior to his death, OCF has failed to show how this "error" inherently warrants remittitur, especially through the standard of review that we apply as the appellate court and the considerable discretion afforded to the trial court. OCF also references that the jury "likely" crafted its award based on sympathy, which it asserts was improper. Although **Haines v. Raven Arms**, cited by OCF, references the judiciary's responsibility "to keep pain and suffering awards within reasonable bounds . . . where the jury cannot help but have sympathy for the plight of the plaintiff," 640 A.2d 367, 370 (Pa. 1994) (citation omitted), that statement of law does not act as a general prohibition on the existence of sympathy in a case. Indeed, it would be near impossible to cordon off a case from *any* element of sympathy, especially when negligence is determined and survival damages must be calculated. Therefore, having considered OCF's weight-based and remittitur claims, we conclude that it failed to demonstrate any reversible basis under existing case law or other authority.

Having found all four claims raised by OCF in this appeal to be unmeritorious, we affirm the judgment entered in favor of Plaintiff and against OCF.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>2/25/2026</u>